EDWARD A. KENNEY AND ESTATE OF HELEN V. KENNEY, DECEASED, EDWARD A. KENNEY, SR., ADMINISTRATOR C.T.A., PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 87417. Filed March 29, 1962.

*Jules I. Whitman, Esq.*, for the petitioners.
*Malin VanAntwerp, Esq.*, for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in income tax due from petitioners for the years 1956, 1957, and 1958 in the respective amounts of $2,096.49, $4,984.28, and $1,626.86.

The issues for decision are:

(1) Whether this Court has jurisdiction over the proceeding, and this issue depends in turn upon whether respondent issued a valid statutory notice of deficiency to petitioners; and

---

(2) Whether amounts received by petitioner Edward A. Kenney (hereafter sometimes called Edward) pursuant to an "Agency Termination and Business Purchase Agreement" which he entered into with Educators Mutual Life Insurance Company [1] (hereafter sometimes called Educators) represent gain from the sale of a capital asset or ordinary income.

FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

Edward is an individual residing at 750 Hilltop Road, Springfield, Pennsylvania. Helen V. Kenney (hereafter called Helen), now deceased, whose estate is also a petitioner in this proceeding, was until her death on January 6, 1960, the wife of Edward and resided at 750 Hilltop Road, Springfield, Pennsylvania. Edward was appointed administrator c.t.a. of the estate of Helen on May 23, 1960.

Edward and Helen filed joint Federal income tax returns for the years 1956–1958 with the district director of internal revenue at Philadelphia, Pennsylvania.

Edward has been in the insurance business since 1919. He was with a casualty and bonding company until 1948 when he became associated with a general agency in Philadelphia. He assisted in forming a special risk department for that agency, with which he was associated until 1952 when he formed his own general agency.

On January 31, 1952, Edward and Educators entered into a contract by which Edward became a general agent for Educators. This agreement provided that Edward was not an employee of Educators but was an independent contractor; that he was to procure and transmit to Educators applications for health, accident, and hospitalization group insurance for campers' medical expense, campers' or camp proprietors' tuition refund, special trip coverage, students' medical expense, students' or school proprietors' tuition refund, and sports coverage; and that the agreement was terminable upon either party's giving 30 days' written notice (in case of notice in April, May, or June, 60 days were required) thereof. In the event of termination the contract provided as follows, this being the only provision in the contract with respect to disposition of property of the agency in such event:

(c) Upon cancellation or termination of this contract under the provisions either of this paragraph or of Paragraph 1, Agent shall immediately return to Company all policy forms, blanks, supplies and property which it has furnished for transaction of business hereunder, and which are in his or his sub-agent's possession or control.

---

[1] The name of Educators Mutual Life Insurance Company was changed sometime between 1952 and 1956 from Educators Mutual Insurance Company.

Provisions were set forth covering the commissions that Edward was to receive from the premiums for various types of policies, and the parties agreed that, since each policy which Edward was to write was for, at most, a 1-year term, no policies written by Edward would be considered "renewals" and all commissions would be computed on initial premiums, there being no different commission schedule for renewals. Except for certain descriptive literature for each type of policy, Edward was to pay for all publicity material himself. Edward could not transfer, assign, or dispose of any interest in the general agency contract, except with the written consent of Educators. With certain exceptions, Edward's agency was to be exclusive as to Edward.

The policies which Edward was to procure for Educators were "special risk" types, that is, they were accident and health policies for campers and students, covering short-term athletic group trips, youth activities, and the period of attendance at camps and schools. Such policies are not available from all companies which provide health and accident insurance.

From 1952 through 1956, Edward, as a general insurance agent, procured insurance policies for companies other than Educators, pertaining to fire, casualty, flood, accident, and health. He also procured special risk policies for companies other than Educators, although for 1956, premiums for Educators' special risk policies accounted for at least 98.1 percent of the total premiums collected on special risk policies by Edward.

Edward obtained "special risk" business from other agents or brokers whose clients might have need for such coverage, and Edward paid such agents or brokers a portion of his commissions for business which came to him through them. Edward was well acquainted with agents and brokers in Philadelphia and through membership in professional associations and by personal contacts, he publicized the fact that he was engaged in writing special risk accident and health policies with which other agents and brokers were not familiar. Other insurance men came to know that he was specializing in special risk insurance and many brought their business directly to him. Also, Edward contacted camp and school officials, acquainting them with his specialized policies. Even though Edward's business may have come to him directly from agents or brokers, he came to know the insured clients in almost every instance, since he was often called upon to advise them about their coverage from time to time.

About 50 percent of Edward's business involved other agents and brokers.

While acting as general agent for Educators, Edward would forward a copy of each policy of insurance he issued on Educators' behalf to Educators' home office and would also retain a copy thereof in his own files.

Edward maintained files and records showing the names of agents and brokers, together with the names of their clients, in cases where business had come to him through other agents and brokers. The names of such agents and brokers were not generally given to Educators. Edward also kept memoranda of discussions and correspondence with insureds in his files which were not given to Educators, nor was Educators supplied with information as to the particular persons with whom Edward dealt at any of the insureds.

About two-thirds of Edward's business as a general agent was in special risk accident and health insurance; about one-third was in fire, theft, and casualty insurance and bond business. For the taxable year 1956, Edward reported net income of $12,339.25 from his insurance business.

In March 1956 an officer of Educators approached Edward with the idea of buying his insurance business. The officer later found that Edward had been approached by others who wanted to buy the special risk accident and health business, and this fact gave Educators some concern. In November 1956 the officer of Educators offered Edward $30,000 for his insurance business and employment with Educators with compensation of $12,000 per year plus a bonus on premiums. The $30,000 figure was based on the premium income flowing from Edward's business.

Edward rejected this offer and counteroffered with a sales price of $40,000 and a salary of $15,000 plus a bonus. Educators rejected this counteroffer. Educators and Edward finally agreed on a purchase price of $35,000 for the insurance business and a salary of $15,000 without a bonus arrangement. Edward expressed a willingness to enter into a 5-year employment contract but Educators was not willing to do so.

Under date of December 26, 1956, Edward and Educators entered into the following agreement:

AGENCY TERMINATION

and

BUSINESS PURCHASE AGREEMENT

WHEREAS, EDWARD A. KENNEY, of Springfield, Delaware County, Pennsylvania (hereinafter called "Kenney") has heretofore acted as General Agent for EDUCATORS MUTUAL INSURANCE COMPANY (which is now, by charter amendment, named Educators Mutual Life Insurance Company, and which is hereinafter referred to as "Company") under "Special Risk General Agent's Contract" dated January 31, 1952, as supplemented from time to time (which contract and supplements are herein referred to as the "Agent's Contract").

AND WHEREAS, Kenney and Company have mutually agreed to terminate said Agent's Contract and agency relationship between them as of December 31, 1956, and for Company's purchase, as of the same date, of Kenney's vested interests in, and good will appurtenant to, business theretofore written by or through him under the Agent's Contract.

THEREFORE, in consummation of said mutual agreement, and in order to more precisely define the terms thereof, Kenney and Company, each intending to be legally bound, agree as follows:

1. The aforementioned Agent's Contract between the parties is hereby terminated as of the close of business Decmber 31, 1956; and neither party hereto shall have any obligation to the other with respect to, or arising out of, said Agent's Contract after that date, except for (a) consummation of any then-uncompleted accounting, remittances, commission payments, charge-backs or other adjustments with respect to premiums theretofore or thereafter collected by Kenney or Company for insurance coverage having an effective date of on or before December 31, 1956, and (b) except as purchase price of Kenney's interest in business under said contract and any other substitutionary rights or obligations of the parties may be expressly provided for in this agreement.

2. Kenney hereby sells, assigns and transfers to Company, as of December 31, 1956, all rights which he may now or might hereafter have in and to Company business solicited or written by or through him at any time on or before December 31, 1956 (including expiration and other records, good will, rights to renewal commissions, and any other items in which Kenney might be considered to have any property or interest), for the price of Thirty-Five Thousand Dollars ($35,000.00), payable in installments (a) of Ten Thousand Dollars ($10,000.00) on the date hereof (receipt of which from Company Kenney hereby acknowledges concurrently with the signing of this agreement), (b) of Ten Thousand Dollars ($10,000.00) on January 7, 1957, (c) of Seventy-five Hundred Dollars ($7,500.00) on July 1, 1957, and (d) of Seventy-five Hundred Dollars ($7,500.00) on January 2, 1958. Company hereby binds itself to pay said three deferred installments at the respective times stated in the foregoing sentence.

Kenney and Company hereby agree that if Kenney should die before receiving any of the aforementioned deferred installments of purchase price for his business, such installments thereafter accruing shall be payable to his wife, Helen V. Kenney, as third-party contingent beneficiary of this agreement, if she shall survive him, and shall not be payable to Kenney's personal representatives unless both Kenney and his said wife should be deceased at time of payment.

3. Kenney hereby warrants to Company that he has absolute and unencumbered title to the business, good will, etc., hereby sold to Company under Paragraph 2, free and clear of any pledges, security agreements or other encumbrances or infirmities in title, and that he has not heretofore assigned any of the same, or rights therein, to any other parties.

4. Kenney agrees that he will not, within three years after either December 26, 1956, or the date of termination of any possible future employment relationship between Company and Kenney (—whichever date shall be the later—) either directly or indirectly, for his own account or as a partner, corporation officer or employee of any other organization, resolicit for any other insurer, or permit such resolicitation by any of his employees or agents, of any business purchased by Company under this agreement.

IN WITNESS WHEREOF the parties have executed this agreement, in duplicate original copies, this twenty-sixth day of December 1956.

(s) Edward A. Kenney (SEAL)

EDUCATORS MUTUAL LIFE INSURANCE COMPANY

By (s) [illegible]

*President*

Attest: (s) A. W. Adee

*Vice President*

Witness: (s) Anna Mae Ranck

The payments called for in this agreement were actually or constructively received by Edward in the years indicated.

Under date of December 29, 1956, Edward and Educators entered into an employment contract by which Edward was to be employed by Educators for a period of 1 year beginning January 1, 1957, at a salary of $15,000 per year. He was to devote his full time and best energies to his duties, which included supervising and securing insurance business at such times as Educators might prescribe, and was not to engage in any other business interests during the period of his employment, other than as an inactive partner with his son in an insurance agency specializing in writing fire and casualty insurance. Educators was to provide office space for Edward at his then office location until his lease expired, and thereafter at the same location if satisfactory terms could be arranged with Edward's landlord, and was also to pay Edward's office telephone, overhead, and travel expenses. The contract also provided:

4. Kenney agrees that he will not, within a period of three years following termination of this Employment Contract or any extension or renewal thereof, either directly or indirectly, for his own account, or as a partner, corporation officer or employee of any other organization, resolicit for any other insurer, or permit such resolicitation by any of his employees or agents, of any Company business which was either (*a*) solicited or written by or through him under the now-terminated General Agent's Contract between the parties dated January 31, 1952, or any supplements or amendments thereto, or (*b*) which was purchased by Company from Kenney under Purchase Agreement dated December 26, 1956, or (*c*) which was serviced in any manner by Kenney under this present employment contract or any extension or renewal thereof.

Edward delivered a bill of sale to Educators, dated April 16, 1957, reciting that he sold office furniture and equipment to Educators for the sum of $1,197.49. He also sold certain stationery and office supplies on hand as of December 31, 1956, to Educators for $220.

During the course of the negotiations between Edward and Educators, neither party attempted to place a separate value on the covenant not to compete contained in the agreement of December 26, 1956. Educators gave no thought to its value because the company had previously had contracts with such covenants and they had been broken and, to the date of trial, Educators had never won a litigated case based on such a covenant.

To the date of trial, Edward had continued to work for Educators at $15,000 a year, plus a bonus beginning in 1959.

On March 22, 1960, respondent sent a letter by registered mail to petitioners advising them that the determination of their income tax liability for the years 1956, 1957, and 1958 disclosed deficiencies in the respective amounts of $2,096.49, $4,984.28, and $1,626.86. The letter was signed on behalf of respondent by an Associate Chief in the

Office of Assistant Regional Commissioner, Appellate, Philadelphia, Pennsylvania, and was addressed as follows:

> Mr. Edward A. Kenney, and
> Estate of Helen V. Kenney, now deceased
> 750 Hilltop Road
> Springfield, Pennsylvania
> Formerly: Edward A. and
> Helen V. Kenney
> Husband and Wife

Only one copy of the letter was mailed. The Office of Assistant Regional Commissioner, Appellate, Philadelphia region, was notified of the death of Helen prior to March 22, 1960, at a time when that office had jurisdiction to issue a statutory notice of deficiency, although the office of the district director of internal revenue, Philadelphia, Pennsylvania, was not so notified. No notice of the existence of a fiduciary relationship was given to the district director pursuant to section 6903 of the 1954 Code,[2] and no notice that separate residence had been established was given to the district director pursuant to section 6212(b)(2) of the Code, prior to March 22, 1960.

### ULTIMATE FINDINGS.

Respondent issued a valid statutory notice of deficiency under section 6212(a) to petitioners on March 22, 1960.

The covenant not to compete, contained in the agreement of December 26, 1956, was incidental to the sale of Edward's business and is nonseverable from goodwill transferred.

Amounts received by Edward in 1956, 1957, and 1958 pursuant to his agreement dated December 26, 1956, with Educators constitute gain from the sale of a capital asset.

### OPINION.

Petitioners contend that this Court lacks jurisdiction because the notice of deficiency issued by respondent was invalid. The basis for this contention is that inasmuch as respondent's delegate had notice of Helen's death prior to the date the notice of deficiency was issued, this constituted notice that separate residences had been established for Edward and Helen, that under section 6212(b)(2) respondent was required to mail duplicate originals of the notice of deficiency both to Edward and to the estate of Helen, that since only the original was mailed, jointly addressed, it is impossible to determine to which party it was mailed, and hence no notice at all was mailed, and this Court lacks jurisdiction. In addition to the fact that there is no claim that respondent's failure to send duplicate originals of the notice of defi-

---

[2] All section references are to the 1954 Code unless otherwise indicated.

ciency resulted in any detriment to petitioners, who filed a timely petition herein, cf. *Clement Brzezinski*, 23 T.C. 192 (1954), *Alma Helfrich*, 25 T.C. 404 (1955), we find no merit in this contention.

Section 6212(a) provides that if the Secretary or his delegate determines that there is a deficiency in tax he is authorized to send notice of such deficiency to the taxpayer by certified or registered mail. Section 6212(b)(2)[3] provides that in case a joint return is filed by husband and wife, the notice of deficiency may be a single joint notice, except that if the Secretary or his delegate has been notified that separate residences have been established, a duplicate original of the joint notice shall be sent to each spouse at his last known address. Section 301.6212–1(b)(2), Proced. and Admin. Regs., provides that the notice of separate residences should be addressed to the district director for the district in which the joint return was filed. The history and purpose for this provision is set out in *Alex H. Davison*, 13 T.C. 554 (1949).

There is no showing that either Edward or Helen ever notified the district director that separate residences had been established. In fact separate residences were never established. Helen simply ceased to have a residence on her death. A literal application of the statute does not require the mailing of duplicate originals of the notice of deficiency. Nor do we find anything in the history or purpose of the statute which would suggest that we construe notice of the death of one of the spouses given in some manner to the assistant regional commissioner, appellate, as being notice to the district director that the spouses had established separate residences. In fact, section 6212(b)(1), which provides that absent notice to the district director pursuant to section 6903 of the existence of a fiduciary relationship the notice of deficiency shall be mailed to the taxpayer at his last-known address, even though such taxpayer is deceased, would imply the contrary. The obvious purpose of Congress in providing for duplicate notices for each spouse where each maintains a separate residence was to provide assurance that each spouse, being jointly and severally liable for the tax due when they have filed a joint return, would be informed of the determination of a deficiency and have the opportunity to act in his own behalf. Both petitioners here were so informed and did act by filing a joint petition in this Court. Absent notice that a fiduciary had been appointed for Helen's estate and that there was a separate address for Helen or her estate, respondent was not required to send duplicate notices of deficiency.

---

[3] SEC. 6212(b)(2). JOINT INCOME TAX RETURN.—In the case of a joint income tax return filed by husband and wife, such notice of deficiency may be a single joint notice, except that if the Secretary or his delegate has been notified by either spouse that separate residences have been established, then, in lieu of the single joint notice, a duplicate original of the joint notice shall be sent by certified mail or registered mail to each spouse at his last known address.

Petitioners' reliance on certain language in *Dudley H. Bryant*, 33 T.C. 201 (1959), taken out of context, is misplaced.

We hold that the notice of deficiency was valid and the Court has jurisdiction with respect to both petitioners.

Turning to the merits, the only remaining issue is whether the $35,000 received by Edward pursuant to the "Agency Termination and Business Purchase Agreement" with Educators represents gain from the sale of a capital asset or ordinary income. Respondent, in support of his determination that the $35,000 was ordinary income to Edward, argues that considering the substance, not the form, of the transaction, the entire $35,000 represented consideration either for Edward's covenant not to compete or for his agreement to enter into Educators' employ; and also that Edward had no vendible goodwill.

First, we agree with respondent that the employment contract and the termination and sale agreement were both a part of the same transaction, that in negotiating and consummating the transaction both parties understood that as a part of the deal Edward would become an employee of Educators. However, this does not mean that the price agreed upon for the sale of the business was in any way related to or a part of the compensation arrangements agreed upon in the employment contract.

The evidence is clear and uncontradicted that neither Edward nor Educators placed any independent value on the covenant not to compete, and we can ascribe none to it. The individual who negotiated the agreements for Educators testified that the company had had considerable experience with such covenants and had never been able to collect on one, so he did not ascribe any independent value to the covenant. The fact that the parties clearly contemplated that as a part of the transaction Edward would become an employee of Educators also indicates that little thought was given to the covenant not to compete. Any value the covenant might represent to Educators was too remote to be separable from the other property and rights acquired. The covenant was an integral part of the termination and sale agreement giving Educators some additional assurance that it would have the maximum opportunity to profit from the business it was purchasing. *George J. Aitken*, 35 T.C. 227 (1960); *Merle P. Brooks*, 36 T.C. 1128 (1961); *Aaron Michaels*, 12 T.C. 17 (1949). It was nonseverable from the goodwill transferred and no part of the $35,000 is allocable to it. *George H. Payne*, 22 T.C. 526 (1954). Compare *Gazette Telegraph Co.*, 19 T.C. 692 (1953), affd. 209 F. 2d 926 (C.A. 10, 1954).

Respondent's contention that the $35,000 was consideration for Edward's agreement to enter into the employ of Educators is likewise unsupported by the evidence or by reason. The evidence is clear that

Edward's salary was negotiated and agreed upon by the parties, that it would continue only so long as Edward remained an employee of Educators and was guaranteed only for 1 year, and that although Edward offered to enter into a 5-year employment contract, Educators refused to do so. It does not stand to reason that Educators would pay $35,000 as a bonus to Edward for entering into an employment contract calling for a salary of $15,000 for 1 year while simultaneously refusing to employ him at that salary for a 5-year term. Furthermore, the $15,000 salary agreed upon was consonant with Edward's reported net income from his insurance business in 1956, and there is no evidence that the $35,000 was paid for anything other than those things stated in the termination and sale agreement. The evidence all indicates that the agreements were entered into between unrelated parties negotiating at arm's length, and that the written agreements represent the actual agreements of the parties.

In our opinion, no part of the $35,000 was paid either as consideration for Edward's entering into the employment contract or as additional compensation to Edward.

Respondent's principal argument seems to be that the $35,000 was not paid for goodwill because Edward had no vendible goodwill and therefore it must have been paid for something else which would be ordinary income. In *George J. Aitken, supra,* this Court held that where a fire and casualty subagent transferred to his employer, an insurance agent, "all the insurance that the [subagent] solicited and sold" while employed by the purchaser, such was the sale of "insurance expirations" which, whether referred to as "trade secrets or confidences, customer lists, goodwill, or just intangibles in the nature of goodwill," constituted capital assets and the amount received therefor was capital gain. In *Malcolm J. Watson,* 35 T.C. 203 (1960), wherein the Court referred to goodwill, as viewed from the transferee's standpoint, as "an opportunity to succeed to the advantageous position of his predecessor," we held that an accountant had vendible goodwill which when sold represented capital gain. This Court has on other occasions recognized the existence of vendible goodwill in professional practices. *Herbert M. LaRue,* 37 T.C. 39 (1961); *Merle P. Brooks, supra; Richard S. Wyler,* 14 T.C. 1251 (1950); *Rodney B. Horton,* 13 T.C. 143 (1949). We think the evidence in this case brings it within the rationale of those cases.

Respondent attempts to distinguish the *Aitken* case on the ground that the insurance involved there was fire and casualty insurance, which is sometimes written for terms of 3 to 5 years so that the expirations, according to respondent, are more valuable, and on the ground that the agency contract provided that the subagent owned the expirations, while the contract here involved is silent on the matter.

We see no reason why the "expirations," or whatever they may be called, on Edward's special risk insurance business were any less valuable to the purchaser of that business than were the expirations involved in the *Aitken* case.[4] The evidence shows that the special risk insurance sold by Edward was usually issued for periods of less than 1 year and was often seasonal. Edward's records contained information with repect to when his customers would need insurance, for what period of time, and the type of insurance needed. True, some of this information might be obtainable from Educators' files if a careful review was made of all policies written by Edward, but this would take considerable time and undoubtedly would not be as complete as the information Edward had. Furthermore, the same thing is true of the fire and casualty insurance involved in the *Aitken* case. Edward's records also contained correspondence with the insureds and with insurance brokers who referred business to Edward, memoranda made by Edward of meetings with different clients and brokers, and the names of the persons to contact in organizations to whom he sold insurance, which information was not available in Educators' files.

Edward had undoubtedly built a reputation both for himself and for Educators' special risk insurance policies both with his customers and with brokers who did not write this type insurance themselves. Certainly the ability, personality, integrity, and acquaintances of any individual selling insurance is important in whatever field of insurance it is. While these may be personal characteristics of the individual which help him build up his clientele, they also generate confidence in his customers in the product which he sells which will, at least initially, give his successor in the business a considerable advantage over his competitors.

All of these tangible and intangible assets, whatever they may be called, go into what is commonly considered goodwill, *Rodney B. Horton, supra*, and together they constitute a capital asset that is vendible because with it the purchaser is in a much better position competitively to continue the business. *Malcolm J. Watson, supra*. Of course this goodwill was more valuable, or at least of more certain value, to Educators when coupled with an employment contract with Edward, but that does not mean that the value of the goodwill must be considered a part of Edward's compensation. The parties apparently bargained in good faith over each contract and between them put a price tag on the value of the goodwill on the one hand and the value of Edward's services on the other hand. We will not presume to rewrite their contracts for them without convincing evidence that

---

[4] Even if they were, this would go only to the price that might have been paid for them and not to whether they were vendible capital assets.

the written contracts do not represent the true agreements of the parties.

But respondent argues that the goodwill, and particularly the expirations, were not Edward's to sell; that absent contractual provisions to the contrary, a general rule of agency applies which makes it the duty of an agent both before and after termination of the agency not to use or communicate information acquired by him during the course of his agency; and that this general rule has not been modified in the field of special risk insurance by custom or by the so-called American Agency System. Even if the general rule is applicable, the fact that an agent may not use information acquired by him during the agency, while possibly making such information less valuable to him, does not necessarily make it of less value to a purchaser who is in a position to acquire and use it.

It is not clear from our rather cursory examination of the Pennsylvania law whether the American Agency System, under which an agent appears to have somewhat greater rights upon termination of his agency than under the general rule, would be applied to this type of an agency agreement. The only two Pennsylvania cases on the subject to which our attention has been directed, *Massachusetts Bonding & Ins. Co.* v. *Johnston & Harder*, 348 Pa. 512, 35 A. 2d 721 (1943), and *McGough* v. *Morgret*, 17 D. & C. 2d 559 (Pa. 1958), do indicate that the Pennsylvania courts at least recognize the right of an agent to use his "expirations" mutually with the principal upon termination of the agency. So even though Edward may not have had the exclusive right to use his "expirations," this does not mean that Educators would not have paid him anything for what rights he did have. It is quite plausible that Educators would have been willing to pay Edward for whatever interest he did have in the "expirations," absent any certainty that Edward had no rights in them. Proof that Edward did not have exclusive rights to the "expirations" would only be evidence to consider in determining whether the $35,000 was actually paid for "expirations" and goodwill or something else.

The agency contract between Edward and Educators was silent with respect to "expirations." However, it did contain a termination clause which provided that upon termination of the contract the agent would return to Educators all policy forms, blanks, supplies, and property which it had furnished for transaction of business. Had Educators wanted to make certain of its exclusive right to expirations it could have done so in this clause of the contract. The agency termination agreement provided that Edward sold, assigned, and transferred to the company all rights which he had or might have in and to Educators' business solicited or written by him on or before December 31, 1956 "(including expiration and other records, good will, rights to

renewal commissions, and any other items in which Kenney might be considered to have any property or interest)," for $35,000. This sum was to be paid to Edward's wife or to his estate in the event he died before the entire amount was paid. The latter provision alone makes it very doubtful that the $35,000 was paid as a bonus for entering into a contract of employment or for future services to be rendered, neither of which would be of any value in the event of Edward's death; instead it suggests that the $35,000 was paid for something then in existence and from which Educators would profit even if Edward should die.

We find nothing in this record to convince us that the $35,000 was paid for anything other than stated in the contract. Those things consisted of records, goodwill, and intangibles in the nature of goodwill, and were capital assets. *George J. Aitken, supra; Aaron Michaels, supra.* Petitioners' gain thereon was gain from the sale or exchange of capital assets.

*D. K. MacDonald,* 3 T.C. 720 (1944), relied on by respondent, is factually distinguishable. There the Court found that the only value the business of a liquidating corporation had, in addition to its tangible assets, was due to the personality and personal ability of its principal stockholder, which the corporation did not own, and that the corporation therefore had no goodwill.

In order to reflect other adjustments conceded by the parties,

*Decision will be entered under Rule 50.*