NORMAN D. ERICKSON AND MARILYN J. ERICKSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Erickson v. Commissioner
Docket No. 3688-90
United States Tax Court
T.C. Memo 1992-585; 1992 Tax Ct. Memo LEXIS 603; 64 T.C.M. (CCH) 963; September 30, 1992, Filed *603 Decision will be entered for respondent with respect to the income tax deficiency. Decision will be entered for petitioners with respect to the additions to tax. For petitioners: Charles J. Reilly. For Respondent: Cheryl A. McInroy. CANTREL
CANTREL
MEMORANDUM FINDINGS OF FACT AND OPINION CANTREL, Special Trial Judge: This case was heard pursuant to section 7443A(b)(3) and Rules 180, 181, and 182. [1]
Respondent determined a deficiency in petitioners' 1986 Federal income tax in the amount of $ 7,983, together with additions to tax under section 6653(a)(1)(A) and (B) in the respective amounts of $ 399.15 and 50 percent of the interest due on $ 4,901. After concessions, [2] the issues for decision are whether petitioners received an additional $ 50,796 of self-employment income during 1986 upon which they failed to report *604 self-employment tax, and whether petitioners were negligent within the meaning of section 6653(a)(1). FINDINGS OF FACT Most of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by reference. Petitioners timely filed their 1986 tax return jointly as husband and wife. At the time the petition in this case was filed, they resided at Mt. Vernon, Maine. The primary issue revolves around petitioner husband's contractual arrangement with Union *605 Mutual Life Insurance Co., Unionmutual Stock Life Insurance Co. of America, and Unionmutual Stock Life Insurance Co. of New York (hereafter collectively referred to as Union Mutual). Accordingly, future reference to petitioner in the singular refers to petitioner husband. Petitioner began working as an insurance agent for Union Mutual in 1963. The General Agent's Contract executed by petitioner and Union Mutual provided, inter alia, that the general agent shall be an independent contractor, that compensation shall be in the form of commissions based upon premiums paid on insurance policies written by the general agent, that the agreement shall terminate at the sole discretion of either party upon 30 days' written notice by one party to the other, and that upon termination of the agreement all records, supplies, and equipment provided wholly or in part by Union Mutual shall be deemed belonging to Union Mutual and delivered to it. For about 20 years petitioner sold Union Mutual policies and received regular commissions thereon. He also received commissions from premiums paid on renewal policies previously written by him which we refer to hereafter as renewal commissions. In November *606 1983, Union Mutual gave petitioner 60 days' notice of its intent to terminate his General Agent's Contract. Petitioner was one of many general agents whose contracts were planned for termination as a part of Union Mutual's restructuring. In December 1983, when petitioner was 57 years of age, petitioner and Union Mutual entered into a General Agent Floored Commission Leveling Agreement II (hereafter the leveling agreement). [3] The leveling agreement provided in general that as of December 31, 1984, Union Mutual would establish a special account for petitioner into which would be paid, thereafter, all deferred first year commissions, renewal commissions, and unpaid regular commissions from policies written by petitioner on or before that date. In addition, Union Mutual was to make an initial valuation of the total amount of such commissions that would accrue in the account and based upon that valuation would make 180 monthly payments to petitioner. Every 5 years the monthly payments were to be adjusted based upon a revaluation of the amount estimated to accrue in the account. The leveling agreement guaranteed that petitioner's monthly payments would not fall below 75 percent of *607 the initial payment amount. It also provided that if petitioner survived the 180-month period, he would continue to receive a lifetime monthly payment equal to 60 percent (minus 2 percent for each year of petitioner's age less than 80) of the initial payment amount. Petitioner's General Agent's Contract was subsequently terminated. He discontinued selling Union Mutual insurance policies and servicing existing policyholders. He left the office where he had worked. His clerical and secretarial staff were no longer available to him; they had been salaried employees of Union Mutual and were retained by the company. Petitioner turned over all of the office records, supplies, and equipment to Union Mutual. *608 In accordance with the leveling agreement reached with Union Mutual, petitioner began receiving monthly payments. As a result of Union Mutual's termination of its general agent's contracts, a number of legal disputes arose. Petitioner did not believe he had the wherewithal to personally bring an action against Union Mutual and did not, himself, get directly involved in the disputes. The record is unclear as to the nature of the allegations raised against Union Mutual or whether any formal complaints were in fact filed in the courts. In any event, Union Mutual settled the disputes by entering into a Settlement Agreement and General Release (the settlement agreement) with all the persons whose general agent's contracts had been terminated, including petitioner. As is relevant here, the settlement agreement, which was entered into on or about December 31, 1985, provides as follows: WHEREAS, the parties recognize the rapidly changing nature of the life and health insurance industry and anticipate these changes will escalate; and WHEREAS, one of the anticipated changes includes the introduction by Union Mutual of new products which will likely have a significant adverse effect *609 upon the persistency of the business covered by General Agents Floored Commission Leveling Agreement which was not foreseen by the parties when said Agreements were entered into; and WHEREAS, a dispute has arisen between the parties regarding their outstanding obligations to each other; and WHEREAS, the parties are desirous of mutually and finally resolving those and all other potential disputes, whether known or unknown, arising out of their business relationships by entering into an agreement establishing fully, finally and with certainty all of their outstanding obligations arising out of the general agent contractual relationship between the parties * * *. NOW THEREFORE, for the mutual consideration herein recited, it is agreed and covenanted that: 1. Norman Erickson hereby forever relinquishes any and all entitlements to any and all payments, present, past and future pursuant to the General Agent Floored Commission Leveling Agreement, and any and all commissions, fees, renewal overrides or commissions, reimbursement allowances, other allowances and/or annuities, present, past and future pursuant to the Formula H General Agent's Contract * * *. 2. This Agreement supersedes, *610 terminates and replaces any and all obligations arising out of any previous agreements, contracts, amendments to contracts, modifications of contracts, representations, promises and understandings between the parties, whether written or oral, express or implied, including the written General Agent Floored Commission Leveling Agreement entered into by the parties * * * which relate in any way to compensation under the Formula H General Agent's Contract * * *. 3. Commencing on or about February 1, 1986, Union Mutual shall pay Norman Erickson or his estate the sum of $ 4,233 each month for 240 months. 4. If Norman Erickson is still living on January 1, 2000, Union Mutual shall pay him the sum of $ 1,814 each month until the date of his death, at which time any and all obligations of Union Mutual to him, his heirs, sucessors [sic], administrators, executors and assigns shall terminate except as provided in paragraph 3 above. * * * 8. Norman Erickson agrees that he has a continuing fiduciary duty of loyalty to Union Mutual, recognizes and acknowledges that this duty includes acting in utmost good faith in matters affecting Union Mutual, and agrees to take no action nor encourage *611 others to take any action that might be detrimental to the business interests of Union Mutual. Actions detrimental to the business interests of Union Mutual shall include, but are not limited to, the following: 1. Targeted, systematic attempts to convert existing blocks of Union Mutual business to other, non-Union Mutual companies; 2. Solicitation of agents or brokers to convert Union Mutual policies to other, non-Union Mutual companies; 3. Using Information contained in records concerning Union Mutual business to approach Union Mutual policy owners for the purpose of converting this business to other, non-Union Mutual companies. In the event that Union Mutual has reason to believe that Norman Erickson may have engaged in actions detrimental to it, Union Mutual shall inform Norman Erickson of its concerns and attempt to resolve the matter before pursuing any legal remedies. 9. With the exception of the obligations of Union Mutual to Norman Erickson set forth under Paragraphs 3, 4, 5 and 6 above, and with the exception of Union Mutual's obligations under any individual insurance policy owned by Norman Erickson, Norman Erickson for himself and his heirs, successors, administrators, *612 executors and assigns, agrees to forever release and discharge Union Mutual, its subsidiaries and affiliates, and their officers, directors, attorneys, agents, and employees ("Releasees") of and from any and all causes of action, claims and demands of whatsoever kind or nature, in law or equity, known or unknown, which they have had, now have, or hereafter can, shall or may have against Releasees, or any of them, for or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of this Agreement and forever, with respect to any matter related in any way to Norman Erickson's status as General Agent for Union Mutual or its subsidiaries and affiliates, or the termination of such status * * *. * * * 11. The parties agree that nothing recited herein shall be construed as an admission of liability or evidence thereof on the part of either party, but shall be deemed merely as the settlement of doubtful and disputed claims. During 1986, Union Mutual paid petitioner $ 1,581 pursuant to the leveling agreement and $ 50,796 pursuant to the settlement agreement. The total of these two amounts, $ 52,377, was reported as nonemployee compensation on Form 1099. *613 Petitioners reported the total Form 1099 amount as gross income subject to ordinary income tax imposed by section 1 on their 1986 Federal income tax return, but did not report any of the amount as being subject to tax on self-employment income imposed by section 1401. Respondent, by notice of deficiency, determined that the $ 52,377 paid pursuant to the leveling agreement and settlement agreement constitutes self-employment income subject to self-employment tax. Petitioner concedes that the $ 1,581 paid pursuant to the leveling agreement is subject to tax on self-employment income, but takes issue with respondent's determination that the amounts paid pursuant to the settlement agreement are so subject. OPINION Section 1401 imposes a tax on the "self-employment income" of every individual. Generally, and as applicable herein, self-employment income means the "net earnings from self-employment derived by an individual * * * during any taxable year". Sec. 1402(b). "Net earnings from self-employment" is defined at section 1402(a) as "gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which *614 are attributable to such trade or business". During prior years when petitioner worked as a general agent for Union Mutual, he sold insurance as an independent contractor and his commission income constituted self-employment income subject to self-employment tax. . This much is clear. The parties agree, moreover, that the payments received by petitioner during the year at issue pursuant to the leveling agreement--payments which the leveling agreement expressly ties to commissions not yet paid but previously earned by petitioner--constitute self-employment income subject to self-employment tax. This concession by petitioner is consistent with the current state of the law. In , we held that for income to constitute self-employment income "there must be a nexus between the income received and a trade or business that is, or was, actually carried on." . In addition, we stated that the income "must arise from some actual (whether present, past, or future) income-producing activity of the taxpayer *615 before such income becomes subject to * * * self-employment taxes". . It is plain that in the case before us, the payments made to petitioner under the leveling agreement represent commission income derived from past services performed by petitioner as an insurance salesman for Union Mutual and thus fit the requirements for imposition of self-employment tax set forth in See also USTC par. 9446 (S.D. Fla. 1962). We still, however, must address the issue at hand of whether the proceeds received by petitioner under the subsequent settlement agreement represent self-employment income subject to self-employment tax. Petitioners have the burden of proving respondent's determination is incorrect. Rule 142(a); . Petitioners contend that the payments they received under the settlement agreement constitute proceeds from the sale of petitioner husband's insurance business rather than income from self-employment. They acknowledge *616 that capital gains treatment of the proceeds is inappropriate and that the amount is taxable as ordinary income. To bolster their argument, petitioners cite , and , affd. . These cases are of no particular assistance to petitioners, however. While it is true that in both cases a portion of the proceeds from the sale of insurance business assets was held to be ordinary income not subject to capital gains treatment, that is not the issue confronting us here. Neither case involves the issue of self-employment tax, and neither case involves a dispute as to whether there was a sale of business assets; both clearly involved an express sale. Petitioners maintain that, although the settlement agreement does not expressly refer to the arrangement as a sale, certain indicia of a sale exist. They assert that employees who formerly worked for petitioner went over to Union Mutual and that all records, supplies, and equipment were turned over to Union Mutual. As is clearly established by the *617 record of this case, however, the individuals who had worked with petitioner had always been salaried employees of Union Mutual. The company merely retained its own people following the termination of petitioner's general agent's contract. And by his own admission, petitioner had owned very little in the way of supplies and equipment retained by Union Mutual. Moreover, his general agent's contract with the company provided that all records, supplies, and equipment furnished wholly or in part by Union Mutual were to be turned over to it upon termination. There was no bargained-for sale or exchange of such property. We have difficulty accepting the argument that a sale was intended given that shortly after Union Mutual's notice to petitioner of its intent to terminate the general agent's contract, he and Union Mutual entered into a commission leveling agreement, an arrangement which petitioners concede was not a sale. Nothing in the record suggests that anything occurred thereafter to alter the arrangement so as to convert it into a purchase of business assets. The settlement agreement by its terms (at paragraph 2, supra p. 6) was intended to supersede, terminate, and replace *618 the leveling agreement. Indeed, the income received under the settlement agreement was of the same character as that received under the leveling agreement. Petitioners concede that the latter is subject to tax as self-employment income. Petitioners maintain that the leveling agreement was merely an interim agreement executed while petitioner and Union Mutual carried out ongoing negotiations for the sale of petitioner's insurance business. This contention is not borne out by the factual record. By its written terms the leveling agreement purports to compensate petitioner over a 180-month period for renewal commissions, etc. It makes no mention that it is of a temporary nature, nor does it refer to any ongoing negotiations. In addition, by his own testimony, petitioner admits that he was uninvolved in any negotiations or disputes with Union Mutual regarding termination of his general agent's contract. He simply acquiesced in the terms offered him in both the leveling agreement and the later settlement agreement. Petitioners further argue that the written terms of the settlement agreement reflect an intention on the part of Union Mutual to purchase petitioner's insurance business. *619 They specifically point to the covenant of noncompetition and the fact that the settlement agreement, unlike the leveling agreement, makes no mention that the payments to be made thereunder are for past, present, or future work performed by petitioner. We are not persuaded. The covenant not to compete is as likely to appear in an agreement terminating petitioner's agency as in an agreement of sale. In fact, a similar covenant appeared in the leveling agreement. Petitioners also miss the point in arguing that the settlement agreement makes no mention of past, present, or future commissions. More important to us is the absence of any language suggesting that the agreement represents a sale. While we have found no case directly on point, nor has any such case been advanced by counsel for the parties, our research has uncovered several cases involving whether payments made by an insurance company to its terminated agent were for the sale or exchange of capital assets or whether they represented ordinary commission income. Where we have upheld a taxpayer's claim that there was a sale of assets, the agreement at issue expressly referred to the transaction as a sale, and an abundance *620 of evidence demonstrated the existence of vendible tangible assets, as well as vendible goodwill in the form of insurance expirations. See, e.g., . But see , and , wherein the evidence did not support a finding of a sale of an insurance business. The record before us contains no express sales agreement, nor does it contain evidence of vendible business assets. The language of the settlement agreement between petitioner and Union Mutual suggests that it was reached as a result of concerns by general agents whose contracts had been terminated as to whether they were going to be fairly compensated for past services under the leveling agreements. The introductory paragraphs to the settlement agreement explicitly mention that Union Mutual's planned introduction of new insurance products will likely have an adverse affect upon the ex-agents' leveling agreements, and that disputes have arisen as a result. We believe that a fair inference to be drawn from this language is *621 that Union Mutual's payments under the settlement agreement were intended to satisfy concerns of former general agents over the adverse affects upon future renewal commissions. Under the settlement agreement as contrasted with the leveling agreement, the monthly payments remain fixed over the whole term. This reinforces our view that the settlement agreement was designed to allay the agents' concerns that their monthly payment would evaporate if Union Mutual discouraged renewals of the policies. To us, this strengthens the conclusion that the payments have the same character as the commissions themselves, and constitute income derived from petitioner's self-employment. ; USTC par. 9446 (S.D.Fla. 1962). Petitioners have adduced no other evidence proving the nature of the payments set forth in the settlement agreement. At most, we can only conclude from this record that petitioners have failed to satisfy their burden of proving respondent's deficiency determination is incorrect. We so hold. We turn now to the issue *622 of whether petitioners were negligent within the meaning of section 6653(a)(1). Negligence under that section means a lack of due care, or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. . With respect to the negligence additions, respondent at page 23 of her brief states: "In this case, respondent determined an addition to tax under section 6653 for only the portion of the deficiency relating to petitioners' failure to treat the amounts received from Union Mutual pursuant to a settlement agreement as self-employment income subject to self-employment tax." While the notice of deficiency appears to be to the contrary, we hold respondent at her word. In this connection and based on this record in its entirety, we hold that petitioners were not negligent with respect to their failure to report self-employment tax on the proceeds received from the settlement agreement. At the time their 1986 return was filed, reasonable persons could have disagreed on the tax treatment to be accorded to those proceeds. [4] In accord with the foregoing *623 Decision will be entered for respondent with respect to the income tax deficiency. Decision will be entered for petitioners with respect to the additions to tax. Footnotes
1. Section references are to the Internal Revenue Code in effect for the year at issue unless otherwise indicated, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioners concede that respondent was correct in disallowing claimed rental property losses totaling $ 7,410 and claimed legal expenses in the amount of $ 1,408. The parties agree that petitioners are allowed, as determined in the notice of deficiency, an itemized deduction of $ 1,479 for real estate taxes paid in 1986 on the claimed rental properties. Petitioners further concede that they received $ 1,581 in self-employment income during 1986 upon which they failed to report self-employment tax.↩
3. In July 1979, petitioner and Union Mutual had executed a General Agent Floored Commission Leveling Agreement I, to become operative upon petitioner's turning age 65. The execution in December of 1983 of the General Agent Floored Commission Leveling Agreement II effectively nullified that first leveling agreement.↩
4. We observe that the 1986 return was prepared by a certified public accountant.↩