**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 26 1997**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

ROBERT SCHELBLE and SUSAN
SCHELBLE,

     Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE,

     Respondent-Appellee.

------------------------

THE COALITION OF EXCLUSIVE
AGENT ASSOCIATIONS, INC.,

     Amicus Curiae.

No. 96-9010

---

**Appeal from the United States Tax Court**
**(Tax Court No. 12747-93)**

---

Richard Clark, Fort Collins, Colorado, for Petitioners-Appellants.

Regina S. Moriarty (Bruce R. Ellisen with her on the brief), Department of
Justice, Washington, D.C. for Respondent-Appellee.

Oren L. Connaway, Austin, Texas, filed briefs for *amicus curiae* Coalition of
Exclusive Agent Associations, Inc.

---

Before **BRORBY, McWILLIAMS** and **KELLY**, Circuit Judges.

---

**BRORBY**, Circuit Judge.

The sole issue in this case is whether "extended earnings" payments received by Mr. Schelble are subject to self-employment tax under 26 U.S.C. § 1401. The Tax Court concluded the payments were subject to self-employment tax. Robert Schelble and Susan Schelble[1] appeal the Tax Court's order upholding the Commissioner of Internal Revenue's determination of deficiencies in the Schelble's Federal income tax for the taxable years 1989, 1990 and 1991 in the amounts of $4,334, $4,489 and $1,362, respectively. We have jurisdiction under 26 U.S.C. § 7482(a)(1). We affirm.

## BACKGROUND

Mr. Schelble was an independent insurance agent for American Family Life Insurance Co., American Family Mutual Insurance Co., and American Standard Insurance Co. of Wisconsin (collectively "the Companies") from 1973 to 1988. On March 13, 1973, Mr. Schelble executed a Career Agent's Agreement ("the Agreement") with each of the Companies. The Agreement defined the relationship between and obligations of Mr. Schelble and the Companies.

---

[1] Susan Schelble is a party to this action because she filed joint tax returns for the years in question with her husband, Robert Schelble. Since only Robert Schelble's income is disputed in this appeal, the remainder of the opinion will refer to Mr. Schelble only.

Pursuant to the Agreement, Mr. Schelble sold and serviced insurance policies on behalf of the Companies. The Agreement specified Mr. Schelble was an independent contractor for the Companies. The Companies agreed to pay insurance commissions[2] to Mr. Schelble based on percentages of premiums on new and renewal policies sold by him. The commissions were "to be in full payment for all services rendered by the agent and to be made as soon as practicable." Either party could terminate the Agreement by giving written notice.

The Agreement provided, when terminated, the agent became entitled to "extended earnings" payments if all of the following conditions were met: (1) the agent represented the Companies for not less than five consecutive years immediately preceding termination; (2) the agent had no less than 400 American Family Mutual Casualty Fire and Health policies in force at termination, and no less than fifty American Standard policies in force at termination; (3) within ten days of termination, the agent returned to the Companies all policies and policy records, manuals, materials, advertising, supplies or other property of the Companies; and (4) the agent did not associate himself in "any sales or sales

_____

[2] The commissions are also referred to as a "sales fee" for new policies and a "service fee" for renewal policies written by an agent.

management capacity with another insurer engaged in writing any of the kinds of insurance written by the company ...." The formula used to compute extended earnings payments varied slightly among each of the Companies.[3] In general, the extended earnings payments were calculated based on a percentage of the renewal service fees paid to the agent during the six- or twelve-month period preceding the month the Agreement terminated. The percentage was based upon the agent's length of consecutive service for the Companies immediately preceding termination of the Agreement. The extended earnings were to be paid in equal monthly installments over twelve to sixty months depending on the total extended earnings.

On March 31, 1988, Mr. Schelble terminated his Agreement with the

---

[3] For American Family Mutual, the amount of extended earnings was computed based on a percentage of renewal service fees paid to the agent during the twelve months preceding the month of termination. The percentage of renewal service fees was based on the agent's total number of consecutive years of service prior to termination as follows: (1) 50% for at least five years but less than ten years of service; (2) 100% for at least ten years but less than fifteen years of service; and (3) 150% for fifteen years or more of service.

For American Standard, the amount of extended earnings was computed based on a percentage of renewal service fees paid to the agent during the six months preceding the month the agreement was terminated. The percentage of renewal service fees was also based on the total number of consecutive years of service but as follows: (1) 50% for at least five years but less than ten years of service; and (2) 100% for at least ten years of service.

Companies. Mr. Schelble met the extended earnings' requirements and elected to receive his extended earnings over thirty-six months. Because he worked for the Companies for over fifteen years, Mr. Schelble was entitled to 150% of his renewal service fees paid to him by American Family Mutual during the twelve-month period preceding the month the Agreement was terminated, and 100% of his renewal service fees paid to him by American Standard during the six-month period preceding the month of termination. Thus, Mr. Schelble was entitled to receive $93,345.89, payable in thirty-five monthly installments of $2,592.95 and a last installment of $2,592.64. Mr. Schelble received extended earnings payments from the Companies as follows:

| | |
|---|---|
| 1988 | $20,743.60 |
| 1989 | 31,115.40 |
| 1990 | 31,115.40 |
| 1991 | 10,371.49 |
| | |
| Total | $93,345.89 |

Mr. Schelble reported the extended earnings on Schedule D, Capital Gains and Losses, as proceeds from the sale of an insurance agency in his Federal income tax returns for 1989, 1990 and 1991.

The Commissioner of Internal Revenue (the Commissioner) determined the extended earnings were self-employment income subject to self-employment tax under § 1401 of the Internal Revenue Code. On March 17, 1993, the

Commissioner issued a notice of deficiency for the Schelble's Federal income tax for the taxable years 1989, 1990 and 1991.[4]

On June 21, 1993, the Schelbles filed a petition in the Tax Court seeking a redetermination of deficiencies issued by the Commissioner for taxable years 1989, 1990 and 1991. The case was submitted with the facts fully stipulated.

Mr. Schelble contended his extended earnings payments were not subject to self-employment tax because: (1) the payments were not sufficiently derived from his prior insurance business to constitute self-employment income; and (2) the payments were proceeds from the sale of his insurance business, a capital asset not subject to self-employment tax.

On June 12, 1996, the Tax Court issued its decision holding the extended earnings payments were self-employment income subject to self-employment tax. *See Schelble v. Commissioner*, 71 T.C.M. (CCH) 3166 (1996). The court reasoned the extended earnings payments were sufficiently connected with Mr. Schelble's prior insurance business to constitute income "derived from a trade or

---

[4] The notice of deficiency made other adjustments to the Schelble's Federal income tax relating to and resulting from the additional self-employment tax assessed, not relevant to this opinion.

business" within the meaning self-employment income under 26 U.S.C. § 1402. *Id.* In addition, the court rejected Mr. Schelble's argument that the termination payments were payments for the sale of his insurance business because there was no express sales agreement nor evidence of vendible business assets. *Id.* Mr. Schelble appeals.

## STANDARD OF REVIEW

We review Tax Court decisions "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." 26 U.S.C. § 7482(a)(1). We review purely factual questions for clear error and purely legal questions de novo. *See Hawkins v. Commissioner*, 86 F.3d 982, 986 (10th Cir. 1996). In the present case, the parties dispute the Tax Court's conclusions after applying the law to the undisputed facts. Therefore, we review the Tax Court's application of the law de novo, since we are "'equally as able as the tax court to draw conclusions from the undisputed facts presented.'" *Anderson v. Commissioner*, 62 F.3d 1266, 1270 (10th Cir. 1995) (citations omitted). The Schelbles have the burden of proving the Commissioner's determination is incorrect. *See* Tax Ct. R. Prac. & Proc. 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933).

**DISCUSSION**

Section 1401 of the Internal Revenue Code imposes a tax on self-employment income of every individual, in addition to income tax. 26 U.S.C. § 1401.[5] Self-employment tax is designed to finance social security benefits paid to self-employed individuals. *See Patterson v. Commissioner*, 740 F.2d 927, 929 (11th Cir. 1984); S. REP. NO. 81-1669, at 153-163 (1950), *reprinted in* 1950 U.S.C.C.A.N. 3287. An independent insurance agent generally is subject to self-employment tax on self-employment income. *See Erickson v. Commissioner*, 64 T.C.M. (CCH) 963 (1992), *aff'd* 1 F.3d 1231 (1st Cir. 1993) (unpublished table opinion) (independent insurance agent subject to self-employment tax on commission income); *Simpson v. Commissioner*, 64 T.C. 974, 983, 989 (1975) (insurance agent was independent contractor subject to self-employment tax).

The issue is whether Mr. Schelble's extended earnings constitute "self-employment income." "Self-employment income" means "net earnings from self-employment." 26 U.S.C. § 1402(b). "Net earnings from self-employment" is "gross income derived ... from any trade or business carried on by such

---

[5] All section references are to the Internal Revenue Code in effect for the years in issue.

individual," less allowable deductions. 26 U.S.C. § 1402(a).[6] For income to be self-employment income, "there must be a nexus between the income received and a trade or business that is, or was, actually carried on." *Newberry v. Commissioner*, 76 T.C. 441, 444 (1981). The "income must arise from some actual (whether present, past or future) income-producing activity." *Id*. at 446. "[S]elf-employment income is determined by the source of the income, not the taxpayer's status at the time the income is realized." *Shumaker v. Commissioner*, 648 F.2d 1198, 1200 (9th Cir. 1981); *see* Treas. Reg. § 1.1402(a)-1(c) (self-employment income may include payments received from services provided in a prior taxable year). Capital gains or losses are excluded from self-employment income. *See* 26 U.S.C. § 1402(a)(3)(A).

Mr. Schelble makes two alternative arguments why his extended earnings payments are not self-employment income: (1) the payments are not sufficiently

---

[6] Under recently enacted 26 U.S.C. § 1402(k), termination payments received by former insurance salespersons from insurance companies after December 31, 1997 are excluded from self-employment income if certain requirements are met, including that the amount of such payment "does not depend to any extent on length of service or overall earnings from services performed for such company (without regard to whether eligibility for payments depends on length of service)." Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 922, 111 Stat. 788, 879-880 (codified as 26 U.S.C. § 1402(k)(4)(B)). However, because Mr. Schelble's payments were received prior to December 31, 1997, this section does not apply.

derived from his prior insurance business because he received the payments for terminating his relationship with the Companies; or (2) the payments are for sale of his insurance business, generating capital gain excluded from self-employment income. These are the same arguments Mr. Schelble made to the Tax Court. We review each argument in turn.

**Payments Derived From Prior Trade or Business**

Mr. Schelble argues his extended earnings payments did not "derive" from a trade or business within the definition of self-employment income. Mr. Schelble relies on two recent federal appellate decisions, *Milligan v. Commissioner*, 38 F.3d 1094 (9th Cir. 1994),[7] *nonacq.* 1995-2 C.B. 1, and *Gump v. United States*, 86 F.3d 1126 (Fed. Cir. 1996), addressing similar issues of whether termination or extended earnings payments received by insurance agents after their termination "derive" from a trade or business. In *Milligan*, the Court of Appeals for the Ninth Circuit reversed the Tax Court's decision, holding termination payments did not "derive" from the agent's prior insurance business so

---

[7] The Commissioner in Mr. Schelble's case also calls our attention to *Jackson v. Commissioner*, 108 T.C.130 (1997). In a set of facts indistinguishable from *Milligan*, the Tax Court found the Ninth Circuit Court of Appeal's reasoning in *Milligan* persuasive and concluded termination payments received by Mr. Jackson did not constitute self-employment income subject to self-employment tax. *Id.*

as to constitute self-employment income. *See Milligian*, 38 F.3d at 1098-99. Similarly, the Court of Appeals for the Federal Circuit in *Gump* reversed the Court of Federal Claims, also holding extended earnings payments did not "derive" from the agent's insurance business. *See* 86 F.3d at 1130. The Tax Court in Mr. Schelble's case refused to apply *Milligan* and *Gump* because the payment schemes in those cases are distinguishable from Mr. Schelble's payment scheme. We agree and therefore do not decide whether this circuit would follow *Milligan* and *Gump*.

In *Milligan*, Mr. Milligan was an independent contractor who sold insurance for State Farm for thirty years. *See* 38 F.3d at 1095-96. Pursuant to his Agent's Agreement with State Farm, Mr. Milligan was eligible to receive "termination payments" following his termination if he: (1) had two or more years of service with the company; (2) returned all State Farm property; and (3) refrained from competing with State Farm companies for one year. *See id.* at 1096. Mr. Milligan terminated his contract with State Farm and complied with the conditions to receive termination payments. *See id.* For the first post-termination year, the payments were calculated based on a percentage of Mr. Milligan's commission income generated during the twelve-month period preceding the month the agreement was terminated. *See id.* The percentage

applied to Mr. Milligan's commission income had no relation to Mr. Milligan's length of service. *See id.* The subsequent four years' payments were based on a fraction of the amount payable in the first post-termination year, less commission charge-backs.[8] *See id.* Although the Tax Court found a sufficient nexus to characterize Mr. Milligan's termination payments as self-employment income, the Ninth Circuit Court of Appeals reversed. *See id.* at 1097-1100.

The Ninth Circuit Court of Appeals concluded Mr. Milligan's termination payments did not derive from his prior insurance business because the payments "linked only to Milligan's previous status as a two year-plus independent contractor for State Farm." *Id.* at 1098. To be "derived" from a trade or business within the definition of self-employment income, the Ninth Circuit required the earnings be "tied to the quantity or quality of the taxpayer's prior labor, rather than the mere fact that the taxpayer worked or works for the payor." *Id.* The court found no other relevant connection between Mr. Milligan's payments and his prior labor for State Farm other than his status as two-year plus contractor. *See id.* at 1098-99. Specifically, the court noted the payments were not deferred compensation because Mr. Milligan was fully paid for commissions earned in

---

[8] Commission charge-backs are commissions paid on policies subsequently canceled. The effect of the charge-back is to retroactively reduce commissions paid but unearned.

-12-

prior years. *See id.* at 1099. The amount of termination payments did not depend on Mr. Milligan's length of service for State Farm, other than the two-year service requirement to qualify. *See id.* at 1096. In addition, the court noted the termination payments

> did not depend upon the level of Milligan's prior business activity because the Termination Payments were subject to two adjustments *unrelated* to any business activity on Milligan's part for State Farm. The State Farm companies adjusted the Termination Payments to reflect the amount of income received on Milligan's book of business during the first post-termination year, and the number of his personally-produced policies cancelled during that year. If all of Milligan's customers had cancelled their State Farm non-life policies during the first post-termination year, then Milligan would have received nothing. The adjusted payment amount depended *not* upon Milligan's past business activity, but upon the successor agent's future business efforts to retain Milligan's customers and to generate service compensation for State Farm.

*Id*. at 1099 (emphasis in original). Thus, for all of these reasons, the court concluded the termination payments were not "tied to the quantity or quality" of Mr. Milligan's prior trade or business so as to constitute self-employment income. *See id.* at 1098.

In contrast to *Milligan*, Mr. Schelble's payments are tied to the quantity and quality of his prior services performed for the Companies. Although the payments in *Milligan* and Mr. Schelble's payments have similar eligibility requirements such as (1) a minimum service requirement; (2) relinquishment of

-13-

company records and policies; and (3) a covenant not to compete, Mr. Schelble's payments have distinguishing features related to Mr. Schelble's prior services. For example, unlike the plan in *Milligan*, Mr. Schelble must have 400 outstanding policies at his termination to be eligible for extended earnings payments. In addition, in contrast to *Milligan*, the amount of Mr. Schelble's payments was computed based on Mr. Schelble's length of service for the Companies. As an agent for the Companies for over fifteen years, Mr. Schelble's extended earnings payments were calculated using a higher percentage than if he had only been an agent for five or ten years. Furthermore, unlike the payments in *Milligan*, Mr. Schelble's extended earnings payments were calculated solely on the percentage applied to service fees paid to him during the twelve months preceding the Agreement's termination. No adjustments unrelated to Mr. Schelble's prior services were made in calculating these payments. Based on these distinguishing factors, we conclude Mr. Schelble's payments are sufficiently derived from his prior insurance business to constitute self-employment income subject to self-employment tax under 26 U.S.C. § 1401.

Mr. Schelble also relies on *Gump*, in which the Federal Circuit Court of Appeals held extended earnings payments received by a Nationwide insurance agent were not taxable as self-employment income. *See* 86 F.3d 1126. However,

the payment scheme in *Gump* is nearly identical to that in *Milligan* and distinguishable from Mr. Schelble's payment scheme. For the same reasons we reject *Milligan*, we also find *Gump* does not apply Mr. Schelble's case.

Mr. Schelble further contends the right to extended earnings payments arises from the cancellation of his relationship with the Companies,[9] not from his prior business. Nevertheless, the right to and amount of payments are tied to the quantity of policies sold for the Companies, the length of Mr. Schelble's prior service and the amount of his prior commissions. Applying *Newberry* to these facts, we find there is a "nexus between the income received and a trade or business that is, or was, actually carried on." 76 T.C. at 444.

**Proceeds From the Sale of Goodwill**

As an alternative argument, Mr. Schelble contends his extended earnings payments are proceeds from the sale of business goodwill, a capital asset under 26 U.S.C. § 1221. Proceeds from the sale of a capital asset are excluded from self-employment tax. *See* 26 U.S.C. § 1402(a)(3)(A). By transferring policy records

_____

[9] If this were the only consideration, then the payments derived from the cessation of Mr. Schelble's business activity would probably not be subject to self-employment tax. *See Newberry*, 76 T.C. at 446 (deciding insurance proceeds compensating taxpayer for inability to operate destroyed grocery were not self-employment income).

to the Companies pursuant to the Agreement, Mr. Schelble maintains he transferred insurance business goodwill developed by him. Policy records and expiration lists containing clients' names, policy expiration dates and types of policies are generally treated as goodwill in the insurance business because of their value to an agent in continuing an established business and securing renewals on existing policies. *See Marsh & McLennan, Inc. v. Commissioner*, 420 F.2d 667, 668 (3d Cir. 1969); *Morris v. Commissioner*, 27 T.C.M. (CCH) 1558 (1968).

Mr. Schelble has failed, however, to show a sale of assets occurred. "A sale of good will, for tax purposes, takes place '... only when the business or a part of it, to which the goodwill attaches is sold.'" *Elliott v. United States*, 431 F.2d 1149, 1154 (10th Cir. 1970) (citations omitted). Mr. Schelble cites *Commissioner v. Killian*, 314 F.2d 852 (5th Cir. 1963), and *Kenney v. Commissioner*, 37 T.C. 1161 (1962), to support his theory the "extended earnings" payments constitute proceeds from the sale of goodwill. These cases do not assist Mr. Schelble. Unlike Mr. Schelble's situation, the facts in both cases involved an express sales agreement and evidence of vendible assets.[10] Although this court

---

[10] The disputed payments in *Killian* were made pursuant to an express sale of Mr. Killian's personal insurance business. 314 F.3d at 853-54. *Kenney* addressed payments under "An Agency Termination and Business Purchase

may view "the substance, not the form, of the transaction," *Commissioner v. Hansen*, 360 U.S. 446, 461 (1959), there is no evidence in the record of vendible assets to support the sale of Mr. Schelble's insurance business, nor does Mr. Schelble's Agreement's contain any language referencing a contract of sale.  In addition, at oral argument, Mr. Schelble could not provide a basis in the record to allocate extended earnings payments under the Agreement as proceeds for the sale of goodwill.  We agree with the Tax Court; Mr. Schelble failed to meet his burden of proof.

In *Erickson v. Commissioner*, 64 T.C.M. (CCH) 963 (1992), *aff'd* 1 F.3d 1231 (1st Cir. 1993) (unpublished table opinion), the Tax Court rejected a similar argument that payments received under a settlement agreement represented a sale because the record "contain[ed] no express sales agreement, nor [did] it contain evidence of vendible business assets." *Id.*  We find the reasoning in *Erickson* persuasive.

The word "sale" means "'a transfer of property for a fixed price in money or its equivalent,' *Iowa v. McFarland*, 110 U.S. 487, 478 [1885]; it is a contract 'to

---

Agreement" expressly referring to payments for the purchase of Mr. Kenney's insurance business along with a covenant not to compete.  37 T.C. at 1164-65.

pass rights of property for money, -- which the buyer pays or promises to pay to the seller [for the thing bought and sold].' *Williamson v. Berry*, [49 U.S. 495], 8 How. 495, 544 [1850]." *Commissioner v. Brown*, 380 U.S. 563, 571 (1965). Mr. Schelble's Agreement contained no language indicating it was a contract for the purchase of his business. The Agreement does not refer to a seller, buyer or specific property to be sold. The Agreement provides "all copies of policies, endorsements, and policy records, manuals, materials, and supplies furnished by the agent by the Company shall be and shall remain the property of the Company and the agent shall be deemed the bailee thereof for the use and benefit of the company." This language does not in any way refer to a sale. The Agreement does not refer to a definite purchase price nor does it provide a basis of allocation of payments to a purchase price of assets. There is no indication the parties intended to treat the payments as a sale of an asset.

Although Mr. Schelble may have intended to treat some or all of the payments as a purchase of his insurance business, once having accepted the Agreement in its form, he "must accept the tax consequences of his choice, whether contemplated or not, ... and may not enjoy the benefit of some other route he might have chosen to follow but did not." *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974) (citations omitted); *see also*

*McCoy Enters., Inc. v. Commissioner*, 58 F.3d 557, 561-62 (10th Cir. 1995).

Despite Mr. Schelble's claim that goodwill was developed by his work and transferred to the Companies, the evidence in the record fails to support the sale of an asset. We affirm the Tax Court's ruling the extended earnings payments were not proceeds from the sale of goodwill.

## CONCLUSION

Accordingly, the judgment of the United States Tax Court is **AFFIRMED**.