**GENERAL ELEVATOR CORPORATION,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

No. 60–87T.

United States Claims Court.

May 4, 1990.

---

**346**

James S. Halpern, Washington, D.C., for plaintiff, with whom was H. Karl Zeswitz, Jr., Washington, D.C.

G. Robson Stewart, Mildred L. Seidman, and Gerald B. Leedom, Washington, D.C., with whom was Asst. Atty. Gen. William S. Rose, Jr., for defendant.

## OPINION

ROBINSON, Judge.

This tax refund suit is before the court after trial on the merits. The parties have submitted post-trial briefs. Plaintiff, General Elevator Corporation, seeks to recover $169,964.32 in withholding taxes, penalties, and interest payments which relate to certain taxable quarters for 1980–1982. Defendant counterclaimed for $924.18 in employment taxes for the quarter ending September 30, 1982. For the following reasons, plaintiff's claim will be granted and, accordingly, defendant's counterclaim will be denied. The court will require by later order further proceedings consistent with this opinion.

## FACTS

When plaintiff, a Florida corporation, filed its complaint, it manufactured, sold, installed, and serviced hydraulic elevators.[1] Plaintiff had six distinct business departments: manufacturing, construction, service, administration, sales and engineering. Construction division employees—those responsible for the installation of plaintiff's commercial and residential elevators, and dumbwaiters—were also called "field" employees. Their primary home bases were Orlando, Sarasota, and Pinellas Park (St. Petersburg), Florida.

Plaintiff timely filed an Employer's Quarterly Federal Tax Return (Form 941) for the taxable periods at issue in this case. Plaintiff paid the taxes as due on its returns. On October 30, 1984, and on November 19, 1984, the Internal Revenue Service (IRS) assessed against plaintiff additional FICA (Social Security) and withholding taxes, penalties, and interest which totalled $145,478.05. On January 15, 1985, plaintiff paid to the IRS all of the assessments except that it paid the amount of $12,633.21 for the 3rd quarter of 1982 against the IRS's assessment of $13,557.39. On January 21, 1986, plaintiff timely filed a claim for refunds which the IRS disallowed on August 1, 1986. Plaintiff filed its complaint in this court on February 4, 1987. Defendant answered and filed a counterclaim seeking $924.18 for the third quarter of 1982.

Plaintiff manufactured its elevators at its plant in Orlando, Florida. Typically, elevators were shipped by piece to a particular job site for assembly and installation by four installation teams. Each team consisted of a mechanic and helper. The en-

---

1. Plaintiff filed its complaint in this court on February 4, 1987. On August 28, 1987, plaintiff filed a voluntary petition in bankruptcy with the Bankruptcy Court for the Middle District of Florida. Plaintiff sought protection under the Bankruptcy Code, 11 U.S.C. § 101, *et seq.*, to reorganize its business affairs, commonly referred to as a "work-out." The court is not aware of the present status of plaintiff's bankruptcy action. The bankruptcy action does not affect the merits of this action, however, because on May 9, 1988, the Bankruptcy Court granted relief from the automatic stay provisions of 11 U.S.C. § 362(a)(1), allowing defendant to pursue its counterclaim.

tire installation of a three-stop elevator generally required about four weeks, or about 160 man hours. Elevators are installed in phases, with each phase performed by a separate team. Since installation is done on a customer's premises, team members were required to travel to job sites and be present at work promptly in the morning and remain there until the end of the day.

Project sites were located throughout Florida and southeastern United States, but most were located in central Florida. Plaintiff's competitors in this area included Westinghouse, Montgomery Elevator, United States Elevator and Miami Elevator.

Prior to 1976, plaintiff was a "union" company and a member of the National Elevator Industry, Inc. (NEII). NEII is the bargaining agent for its members in union negotiations with construction division employees relating to wages and other matters. All union companies had contracts requiring reimbursement of construction division employees for some of their travel expenses incurred in going from their homes directly to the job sites. These payments were called "per diem" payments in the construction industry, and prior to 1976 plaintiff paid them in conformity with its union contract. Plaintiff's per diem payments were computed by use of "concentric circles" which, for field employees assigned to the Orlando and Sarasota areas, had as the center point the local courthouse. For those assigned to the Pinellas Park area, the center point was the company's office. The first of these concentric circles, with a radius of 15 miles from the designated center point, did not allow payment of any per diem regardless of the actual number of miles traveled to the job site. The second circle with the same center point but with a 35–mile radius allowed payment of $6 in per diem for field employees traveling to job sites located beyond the first circle but within the second circle. The third circle extended to the 50–mile radius line. It allowed payment of

$12 in per diem. Finally, a per diem payment of $25 was made for travel to all job sites located beyond the 50–mile radius line. Thus, all field employees were paid a per diem payment determined on the basis of location of the particular job site with respect to three center points. Plaintiff's competitors all had similar per diem arrangements, although the number of circles and the distances involved may have varied.

Plaintiff, in 1976, became "non-union." Its construction division employees continued to be paid "per diem" based upon the same concept of use of concentric circles from a courthouse or home office center point in the three described primary market areas in central Florida. However, to maintain its skilled work force and to compete with other elevator companies, plaintiff had to pay par or higher than union wage scales since its health and other benefit plans were acknowledged to be inferior to union company packages.[2] Plaintiff paid both per diem and "travel time."[3] Other competing companies continued to pay per diem.[4]

Plaintiff's field employees filled out weekly work slips and submitted these in order to receive the per diem payments. These work slips reported hours and project sites worked. Using these work slips, clerical personnel prepared payroll timesheets for each reporting employee showing the per diem, if any, to be paid. The amount of per diem paid did not vary according to the employee's wage rate or other employment factors. Although separate checks were at one time used to pay per diem, during the years at issue, only one check was issued, but expenses were shown as a separate item on the employee's check stub and on the payroll register.[5]

IRS Revenue Agent Ivan R. Holmberg conducted an audit of plaintiff's Quarterly Employment Tax Returns (Form 941) for the years 1980, 1981, and 1982, during which he reviewed the related weekly work

---

**2.** TR 21, 22.

**3.** TR 22.

**4.** TR 44, 45.

**5.** TR 43.

348

slips, payroll, timesheets, and Forms W–2 and determined on a weekly basis those employees who received per diem allowances. He summarized his weekly computation of per diem allowances into a monthly analysis and then into a quarterly basis. The results of Mr. Holmberg's audit for these three years are tabulated on schedules entitled Employment Tax Audit Changes (Form 4668) (See Joint Exhibits 45–AS, 46–AT, 47–AU). These schedules show only per diem payments.

Other than the per diem, employees were reimbursed for out-of-pocket expenses for materials and hardware items upon submission of paid receipts and workslips. If a field employee had to travel to a job site beyond the 35 or 50–mile zone, he would receive, in addition to per diem, a reimbursement for mileage at a specified rate per mile for his first trip to the job site computed from the applicable center point to the job site, and upon completion of the job, mileage for the last return trip from the job site to that center point.[6] Since the field employees went directly from their homes to the job site and returned to their homes, generally neither the per diem nor the mileage received was directly related to the actual miles traveled.[7] Moreover, the reimbursement of mileage and per diem was unrelated to whether the employee actually stayed overnight at or near the job site or to what the employee might actually spend for food or lodging.

William S. Westmoreland, plaintiff's comptroller, testified that per diem payments were not computed based upon an effort to reasonably approximate what the actual travel expenses of the employees might be for the particular zones involved.[8] In fact, he stated that plaintiff would not have increased the per diem rate had the employees' travel costs in practice been more than that payable using the zone system.[9] He testified that per diem payments were arbitrarily fixed, they were related to what the company could afford in order to make a profit, and they did not result from a definitive cost study of travel costs to and from various zones.[10]

All field employees were required to report by phone each Thursday to provide a status report for each team. Thus, they were not required to routinely report in person to the company's local office to receive job assignments and the like.

Although Mr. Westmoreland could not explain exactly what criteria were used in fixing the per diem rate, Mr. Arthur E. Johnson, another witness for plaintiff, testified:

We did a lot of things. We took a look at what the union was paying at the time. There were times that we did studies to find out what motels were in the areas that we were staying, what it cost for different restaurants in the areas where we had projects. We talked to hotel and motel owners to try to establish, or get a break for our people during the season in Florida. There was one pretty thorough study done in this area, and many tests.[11]

Further, Johnson testified:

[per diem is a] cost of having a mechanic on a job site to perform that job. The requirement was that once you originally travel to the job site that you remain there or that you appear on that job at starting time in the morning which standard hours were 8:00 a.m. and that you were there at quitting time, and that the

6. TR 60.

7. TR 81. For example, an employee might live within two blocks of a distant job site and, therefore, incur no significant travel expense. Obviously, the employee in such case would incur no lodging expense because no overnight stay would be necessary. Nevertheless, that employee would receive the maximum daily per diem payment of $25 plus the limited mileage reimbursement because the job site was located over 50 miles from the center point. The converse of this situation, of course, could just as easily occur where the employee might live at some distance from the job site and have to drive for well over 50 miles to report for work, but receive little or no per diem or mileage.

8. TR 84.

9. TR 84.

10. TR 88.

11. TR 113.

standard time was 4:30 p.m. in the afternoon.[12]

Johnson also testified that reimbursement of actual expenses for travel was impractical because "you would be fighting a battle with them because they've lost receipts or they've altered receipts or they've stayed in places that were more expensive than fit into your guidelines." [13]

When field employees incurred extra travel costs not due to their own fault, plaintiff paid such costs including hotel, time, and mileage. For example, if a team was required to leave one work site and drive to another, both the mechanic and helper would receive a mileage and a travel time payment which did not affect the per diem payment which might be due. Although meal and room costs varied significantly from area to area and between times of the year, plaintiff did not adjust the per diem payment to reflect these fluctuations.[14] It made no difference whether an employee chose to drive 100 miles to go home at night or stayed overnight at the job site. This was not plaintiff's concern. According to Johnson, the concern was "that the mechanic was on the job at 8:00 in the morning, worked during the day, and was on the job at quitting time in the afternoon and that he's be back there at 8:00 the following morning." [15]

The per diem was considered a reimbursement of travel expenses for the mechanic who is required to carry his tools and other items to work. Beyond the first 15 miles, he incurred "unusual" expenses including spending time "travelling this additional mileage and his gas and vehicle expense." [16] Per diem was not considered a reimbursement for food expenses.[17]

Each construction division employee was paid on the basis of a weekly job ticket which he submitted to the company. The ticket included a job site identification number, the hours worked at a particular job site each day, and the per diem amount, if any, for that job site location. Thus, the initial determination of his eligibility for per diem was determined by reference to the job site location and the company's written guidelines.

If the employee's job ticket upon review was found to be accurate, the payroll department transferred the information to weekly timesheets from which weekly pay checks were issued. The one check issued covered wages including overtime, reimbursement of out-of-pocket miscellaneous expenses (for job site purchases of tools or supplies), reimbursement at $.20 per mile for use of personal vehicles for company purposes, mileage paid for travel and round trip for jobs in zone 4 also at $.20 per mile, mileage paid for the distance between jobs if they were transferred from job to job during the day also at $.20 per mile, and daily per diem payments.

Plaintiff did not require any field employees to account for any expenses actually incurred relating to travel to job sites or provide receipts for overnight lodging. Thus, plaintiff reported only the total amount of regular hourly wages and overtime paid to field employees on their annual compensation statement, Form W–2. It did not report the per diem payments either as other compensation or as expense reimbursement on any other statement. It did not keep weekly, monthly, quarterly, or yearly summary records showing the per diem payments made to field employees. Joint Exhibits 21–U through 41, AP, 43–AC and 44–AR.

Mr. E. James Walker, Labor Relations Manager for NEII, a witness for plaintiff, testified that under local union contracts applying in the Orlando, Florida area, which were negotiated in 1978 and 1981 by an NEII group on behalf of its members, per diem payments were computed on a zone basis using the concentric circle sys-

12. TR 127–128.

13. TR 137.

14. TR 157–158.

15. TR 160.

16. TR 246.

17. TR 247.

**350**

tem.[18] While some agreements have no more than two zones, others have as many as ten concentric circle zones extending out 100 miles from a center point.[19]

In 1976, the IRS issued Revenue Ruling 76–453, 1976–2C, B, 8b, which proposed to modify its position concerning certain work-connected expenses incurred by employees. In this ruling the IRS reconsidered and changed its position concerning transportation costs to and from a job site. In the ruling, the IRS addressed the following situation:

> During an entire taxable year, employee C works at various temporary locations for periods of not more than one month at any one location. C drives varying distances each way between C's residence and each such temporary work location. C, pursuant to an [sic] union agreement, received a flat $7 daily amount as reimbursement for the transportation costs incurred. C is not required to account to the employer for such expenses.

The ruling concluded that the reimbursements were subject to withholding. However, the IRS later suspended indefinitely the effective date of Revenue Ruling 76–453. (Exhibits P–50, P–51.) This ruling, because of its potential impact upon the construction industry was of concern to that industry. The suspension was due to the imposition by Congress of a moratorium against the IRS's pursuing the position advanced in the ruling. *See* P.L. 95–427, § 2, 95th Cong., 2d Sess. (Oct. 7, 1978); Tax Treatment Extension Acts of 1977, P.L. 95–615, § 2, 92 Stat. 3097, and Act of December 29, 1979, P.L. 96–167, § 2, 93 Stat. 1275 (1979). The IRS has never attempted to reactivate that ruling, although it has continued to revise its position respecting transportation costs. *See* Manual Transmittal 4500–444 (March 28, 1988) (Appendix at A–22).

In 1983, Long Elevators and Machie Co., Inc. (Long) of Springfield, Illinois, was audited by IRS Agent Mark B. Gregory. As a result of that audit, Agent Gregory wrote a letter dated October 21, 1983, addressed to Long, which concluded that the $18 per diem payable to Long's field employees for job sites located 35 miles and beyond from the City Hall of Rockford, Illinois, as a center point required issuance of a Form W–2 to these employees, but specifically stated that "no withholding of income tax or payment of employment tax should be made on these [per diem] accounts." (Exhibit P–48.)

In a second letter dated December 19, 1983, written by Agent Gregory to Mr. Joseph E. Brown of the firm of Klein, Brown and Carter of Springfield, relating to these same questions addressed in his earlier letter to Long, he reiterated his earlier opinion and supplemented it with respect to the treatment of per diem as follows:

> f) The authority for not withholding on these amount can be seen in Reg. 31.-3401(a)–1(b)(2), Rev. Ruling 55–196M 1955–1CB492, Rev.Rul. 69–592, 1969–2Cb 193, and finally in *Central Illinois Public Service Co.* (U.S. Supreme Court, 41 AFTR 20, 78–718, 78–1 USTC 9254). In all of the above cases, the wages are not subject to withholding tax.

This letter was a result of an inquiry on behalf of the National Elevator Industry, Inc. (Exhibits P–49 and P–62.) As a result of Agent Gregory's second letter, NEII, after meetings with industry representatives in November 1984, in a memorandum dated November 28, 1984, recommended to its members that zone expenses or per diem expenses and mileage in excess of 20½ cents-per-mile be reported on the employee's W–2 and stated that "the employer is not obligated to withhold income taxes or FICA taxes from expense payments." (Exhibit P–56). It was the practice in the elevator industry prior to 1984 not to withhold on per diem payments and that practice continued after 1984 and generally remains the practice to date.[20]

---

**18.** TR 212–213.

**19.** TR 215.

**20.** TR 234.

The IRS's audit of plaintiff's returns occurred as a result of an audit by Agent Holmberg of the individual income tax returns of one of plaintiff's stockholders. Holmberg had no prior experience in the auditing of elevator companies and had no direct personal knowledge of withholding practices of other elevator companies whether in the region served by plaintiff or elsewhere.[21] However, he advised plaintiff that, in his opinion, the per diem payments which he determined had been made to plaintiff's field employees during the years in suit were subject to withholding.[22]

Holmberg testified that although he had no IRS instruction manual covering per diem payments to support his opinion, there was "established case law" that per diem payments are "reimbursement or repayment for an employee's non-deductible commuting expenses."[23] He further testified that if the taxpayer had separately reported the per diem amounts paid in each employee's W-2 form, there was no requirement for withholding the per diem payments.[24]

## DISCUSSION

■ The issues in this case are whether the per diem payments to the employees of General Elevator are "wages," and if so, whether General Elevator, as withholding agent of the IRS, had adequate notice that these payments were to be withheld as wages. "Wages" is defined in the Internal Revenue Code as "... all renumeration ... for services performed by an employee for his employer...." 26 U.S.C. § 3401(a). The committee reports at the time § 3401(a) was in effect (during the taxable years here in question) consistently stated that wages meant renumeration "*if* paid for services performed by an employee for his employer." *Central Illinois Public*

*Service Co. v. United States*, 435 U.S. 21, 27, 98 S.Ct. 917, 920, 55 L.Ed.2d 82 (1978) (emphasis in original).

The definition of wages as used in § 3401(a) is clarified in § 31.3401(a)-1(b)(2) of the Treasury Regulations, which provides:

*Traveling and other expenses.* Amounts paid *specifically*—either as advances or reimbursement—for traveling or other bona fide ordinary and necessary expenses incurred or reasonably expected to be incurred in the business of the employer are not wages and are not subject to withholding. [Emphasis added.]

Cases hold that the definition of wages is narrowly construed. *Central Illinois Public Service Co. v. United States*, 435 U.S. 21, 29, 98 S.Ct. 917, 921, 55 L.Ed.2d 82 (1978); *e.g., Hotel Conquistador, Inc. v. United States*, 597 F.2d 1348, 220 Ct.Cl. 20, 30 (1979). Indeed, "wages," in the withholding context, is defined more narrowly than income. *Hotel Conquistador, Inc. v. United States*, 597 F.2d 1348, 220 Ct.Cl. 20, 30 (1979). Even though certain payments of expenses to an employee may constitute income to the employee, it does not necessarily follow that they will be deemed "wages" subject to the withholding provision.

In addition, the Supreme Court has held that the "total package of renumeration designed to attract and hold the employee" are wages. *Central Illinois Public Service Co. v. United States*, 435 U.S. 21, 28-29, 98 S.Ct. 917, 921, 55 L.Ed.2d 82 (1978). If there is a relationship between a payment and the performance of services, there is a duty to withhold. *Humble Oil & Refining Co. v. United States*, 442 F.2d 1362, 194 Ct.Cl. 920, 930 (1971). Of course, this relationship must be viewed from the

---

21. TR 253–254, 279.

22. TR 259. Neither the mathematical accuracy of Holmberg's computations nor the amount of withholding is in dispute. TR 267. Holmberg testified that he was told by Westmoreland and Morris that the per diem payments were computed from each employee's residence. However, he saw no maps showing concentric circles which would confirm that information.

Regardless of what Holmberg may have been told, it is not disputed that the per diem payments were actually computed using the described local center points for all field employees.

23. TR 281–282.

24. TR 283.

standpoint of the employer's purpose in making the payment. *Stubbs, Overbeck & Assoc. v. United States*, 445 F.2d 1142 (5th Cir.1971).

The evidence adduced at trial shows that all of plaintiff's construction division employees who traveled to job sites beyond 15 miles from their assigned work center points received per diem allowances in addition to regular hourly wages. The calculation of the amount of the per diem payments at issue was based only on the distance traveled from the three center points which were the courthouse in Orlando and Sarasota and the company's office in Pinellas Park.

While it is true plaintiff paid per diem in part to offset travel costs to the job site, its payments were made primarily as a "substitute" for compensation for services performed. Plaintiff paid the per diem as an aspect of compensation for services in order to keep the company competitive with other local unionized elevator companies, and to attract and retain skilled employees who might otherwise go to a union company. Furthermore, the per diem was paid to ensure that the employee, in performing his services, would make it to the job site—as an inducement—at the appointed time.

Plaintiff's witness' testimony that they made some effort to determine what the employee's actual travel costs would be in the areas which plaintiff services is completely unpersuasive. Plaintiff never performed a *sound* analysis of such costs. What studies were done were inconclusive, limited as to time and areas covered, and did not result in any change in the amount of per diem allowances for the three zones beyond 15 miles. Although plaintiff's witnesses testified that the per diem allowances "reasonably approximated" the field

employees' average travel costs, this conclusive testimony was not supported by any objective evidence and was not persuasive.

The court is persuaded that plaintiff's per diem payments, on the basis of the particular facts presented in this case, have not been shown to meet the test set forth in Treasury Regulation § 31.3401(a)–1(2). The court finds that plaintiff's per diem payments were not reasonable approximations of travel costs or that plaintiff's per diem payments allowed for cost variances among different localities. In view of the candid and believable testimony of plaintiff's own witnesses,[25] this conclusion is inescapable. Thus, plaintiff, on these particular facts, has failed to sustain its burden of proof with respect to the nature of and basis for these per diem payments.[26]

### The Notice Requirement

■ Plaintiff contends that it is still entitled to recover the amount sought from defendant because it had no notice of any duty to withhold. Plaintiff's argument is premised upon the United States Supreme Court's ruling in *Central Illinois Public Service Co. v. United States*, 435 U.S. 21, 98 S.Ct. 917, 55 L.Ed.2d 82 (1978), that, without "clear and precise" notice that there is a duty to withhold, no employer could reasonably suspect that a withholding obligation existed. Plaintiff argues that as a "deputy tax collector" or agent of the Government for purposes of withholding, its obligation to withhold must be clear. Further, since no instructions from its principal were received, plaintiff argues it was under no obligation to withhold from the per diem payments at issue. Finally, plaintiff contends that to now find that it

---

**25.** The testimony of Mr. Westmoreland and Mr. Johnson respecting plaintiff's justification and rationale for the per diem payments is particularly revealing. Zones 2 and 3 payments to field employees were $6 per day and $12 per day respectively. But such employees normally would not be expected to stay overnight. If they were reimbursed for "vehicle" expenses, such as for mechanical repairs or for purchase of special vans in which to carry tools or supplies, plaintiff presented insufficient evidence to show what these expenses actually were. Thus,

the court has no basis for concluding that the per diem payments reasonably approximated these unspecified "vehicle" expenses.

**26.** The court wishes to make it extremely clear that this holding is based solely on these particular facts established at trial. We do not hold that, in all cases, per diem payments to employees are wages under § 3401(a) of the Internal Revenue Code.

should have withheld on such payments would constitute a prejudicial retroactive imposition of the duty to withhold and would undermine the uniformity of the withholding system since the evidence shows that to date plaintiff is the only elevator company upon which the IRS has imposed this obligation.

Defendant contends that plaintiff knew about Rev.Rul. 76–453 and, although that ruling, which was suspended indefinitely, does not specifically cover plaintiff's practices, it served as sufficient "notice" that plaintiff should have been alerted to investigate the law about possible withholding to ensure that its per diem system was in compliance with the regulations. Defendant next argues that even if Rev.Rul. 76–453 did not constitute notice, because the congressional moratorium on that ruling specifically states that the rules in effect before Rev.Rul. 76–453 are to be given full effect, two other rulings relating to "somewhat similar circumstances" to plaintiff's provided sufficient notice as to the "possible" requirement of withholding on "travel allowances." [27] Further, defendant states that plaintiff did not follow the advice that NEII gave its members, subsequent to receiving its legal counsel's advice, that each employer should contact its own tax advisor concerning their expense arrangements. For this reason, defendant apparently contends plaintiff should be found to have had notice of these rulings, should have sought the advice of counsel, and should have withheld accordingly. However, defendant without citation of any

authority, argues that the notice question is irrelevant because "it is incumbent upon taxpayers to be knowledgeable as to the internal revenue laws that affect them." Therefore, defendant argues that since the regulations (presumably the cited Revenue Rulings) clearly state the circumstances under which travel allowances will be exempt and plaintiff failed to prove sufficient facts at trial that entitled plaintiff to have the benefit of this regulation, plaintiff had adequate notice that the per diem payments must be considered as wages subject to employment taxes.

The "deputy tax collector," the employer, must have adequate notice so that it will "know what the IRS thinks the law is and therefore what actions they have to take." *Central Illinois Public Service Co. v. United States*, 435 U.S. 21, 31–32, 98 S.Ct. 917, 922–23, 55 L.Ed.2d 82 (1978); *McGraw Hill, Inc. v. United States*, 623 F.2d 700, 224 Ct.Cl. 354, 364 (1980). The facts in this case do not establish a precise and clear duty to withhold. A careful review of all of the revenue rulings which defendant cites as having provided adequate notice to plaintiff of its obligation to withhold from per diem payments clearly shows that none specifically apply to the circumstances respecting plaintiff's per diem arrangement.[28]

Defendant's position regarding notice appears to be somewhat contradictory. On the one hand it agrees that reliance on a revenue ruling is specifically limited to the particular facts stated in the ruling. (Def.Br. at 17, n. 10). On the other hand, it

---

**27.** Both rulings confront the question of a withholding requirement on "travel allowances." Rev.Rul. 190, 1953–2 Cum.Bull. 303, and Rev. Rul. 74–445, 1974–2 Cum.Bull. 325. Defendant states on brief that Rev.Rul. 74–445 provides sufficient notice as to the possible withholding. In that ruling workers received per diem payments *whether or not they incurred any bona fide travel expenses.* The ruling found that, as a result of the inadequate relation between the per diem and actual expenses, the "travel allowance" payments were not advances or reimbursements for expenses incurred or reasonably expected to be incurred in the business of the employee and were, therefore, subject to withholding. Thus, the facts recited in Rev.Rule 74–445 are not sufficiently similar to the facts in this case to require a finding of notice to plaintiff. In the case at bar, it cannot be disputed

that all employees who received per diem incurred otherwise uncompensated bona fide travel expenses.

**28.** Plaintiff recently filed a supplemental brief regarding IRS Notice 894, which applied to the year 1989. Plaintiff contends that defendant, in this notice, has only recently given notice of its position on an employer's duty to withhold, prospectively, from expense reimbursement payments. Indeed, this notice, although only applying to 1989, is simply the latest effort of the IRS to clarify its position on the issue of withholding in this context. IRS Notice 894, in some respects, characterizes the lack of clarity that has historically existed as to the duty of an employer to withhold from per diem payments.

admits that Revenue Ruling 76–453, upon which it relies "does not cover plaintiff's situation." (Def.Br. at 17–18). Revenue Ruling 76–453 was suspended indefinitely. If anything, the suspension indicates that plaintiff had notice that it did not have to withhold. The court is not persuaded by defendant's argument that the "mere existence" of that ruling (and its suspension) should have alerted plaintiff to investigate the law presumably with the result that it would have concluded its per diem payments were "possibly" subject to withholding. To the contrary, this court's careful review of all pertinent Revenue Rulings which the parties cited, the case law, and IRS informal administrative directions, leads the court to conclude that plaintiff had inadequate notice that it was required to withhold on per diem payments. In sum, these rulings leave a speculative gap where plaintiff, when faced with ambiguous or inapplicable interpretations, cannot reasonably be held to have received the degree of notice the law requires. *Central Illinois Public Service Co. v. United States*, 435 U.S. 21, 31–32, 98 S.Ct. 917, 922, 55 L.Ed.2d 82 (1978); *McGraw Hill, Inc. v. United States*, 623 F.2d 700, 224 Ct.Cl. 354, 364 (1980). After investigation and obtaining an opinion of its counsel, the NEII concluded, and so advised its members, that per diem payments were *not* subject to withholding.[29] Its review of the matter took into account Agent Gregory's letter opinions which specifically found that per diem payments were not subject to withholding. Further, the IRS elected not to audit any other central Florida elevator companies regarding per diem withholding

even after auditing plaintiff in 1984. If the issue were that clear cut against plaintiff, it seems reasonable that the IRS would have already audited and sought recovery of FICA and income withholding taxes from other elevator companies similarly situated.[30]

## CONCLUSION

Plaintiff's evidence adduced in this case is insufficient to conclude that those payments were not wages under § 3401(a) and its accompanying regulations. Consequently, under the particular facts of this case the court must view all of these payments as wages under the provisions of the Internal Revenue Code and, therefore, subject to withholding if there was adequate notice to plaintiff of a duty to withhold. The court further concludes that plaintiff has failed to show that its per diem arrangement involving three payment zones reasonably approximated the actual travel expenses of its construction division employees for work at job sites located within those zones.

However, plaintiff has shown that it had inadequate notice of the fact that the IRS viewed per diem payments under these circumstances as being subject to withholding. Consequently, the court finds that adequate notice to plaintiff, prior to the years in question, was a legal requirement which was not met by the Revenue Rulings, interpretations, and case law, and that defendant cannot be allowed to retroactively impose a withholding obligation upon plaintiff. The court will by later or-

29. Nor can it be said that the NEII letter constituted notice. That letter stated that an employer is *not* obligated to withhold income taxes or FICA taxes from travel expense payments, but cautions that each employer should review the issue with its own tax advisor. This letter was sent to plaintiff *after* the audit, and specifically advised that there was no duty to withhold.

30. Finally, plaintiff contends that for defendant to impose a duty upon it to withhold for the three years in suit would constitute a retroactive application of a tax law which would constitute an abuse of discretion. Defendant does not address this argument on brief. Although under limited circumstances, retroactive income tax legislation has been upheld, *see, e.g., United*

*States v. Darusmont*, 449 U.S. 292, 101 S.Ct. 549, 66 L.Ed.2d 513 (1981); *Welch v. Henry*, 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87 (1938), such retroactive application for reasons of equity has not been judicially extended to withholding tax laws. However, this court need not find that such an extension under the circumstances here presented would constitute an abuse of discretion. Since the court has determined that plaintiff was entitled to adequate notice of a duty to withhold and that the notice provided by then current Revenue Rulings, administrative interpretation, and case law was inadequate, it need not reach this question in order to find that plaintiff is entitled to the refund it seeks.

der schedule further proceedings. No costs.

IT IS SO ORDERED.