**NORTH DAKOTA STATE UNIVERSITY, an agency of the State of North Dakota, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. A3–98–50.

United States District Court, D. North Dakota, Southeastern Division.

Nov. 19, 1999.

---

Garry A. Pearson, Jon Jay Jensen, Pearson, Christensen, Clapp, Fiedler, Fisher & Jensen, Grand Forks, ND, for ND State University, plaintiff.

John T. Schneider, U.S. Attorney's Office, Fargo, ND, Lawrence A. Casper, U.S. Department of Justice, Washington, DC, Daniel R Conrad, U.S. Department of Justice, Tax Division, Washington, DC, for USA, defendant.

### MEMORANDUM AND ORDER

WEBB, Chief Judge.

### I. Introduction

Before the court is defendant United States' motion for summary judgment. (doc. # 22). Plaintiff North Dakota State University (NDSU) opposes the motion, (doc. # 26), and advocates instead that summary judgment be granted in favor of itself since there are no material issues of fact to be tried. Although NDSU has not formally filed a cross-motion for summary judgment, the United States has not and does not object to the Court treating this as such. The parties have agreed that this matter should be decided in a summary fashion, and the court has authority to do so. *See Johnson v. Bismarck Public School District*, 949 F.2d 1000, 1004–05 (8th Cir.1991).

Upon consideration of the written and oral presentations of the parties, the court, as explained in this memorandum, grants

partial summary judgment in favor of the United States and partial summary judgment in favor of NDSU.

## II. Background

Simply stated, this is a tax refund case. The parties essentially agree to the material facts involved, but disagree as to the legal conclusions to be drawn from those facts.

On June 22, 1995, NDSU was audited by the Internal Revenue Service (IRS) and assessed wage withholding and Federal Insurance Contributions Act (FICA) taxes.[1] *See* 26 U.S.C. § 3101 et. seq. The FICA tax assessments related to wages paid by NDSU to certain resident aliens employed as teachers and trainees and to payments made to tenured faculty members and administrators through an early retirement program. NDSU paid the assessed taxes and subsequently filed an administrative claim for refund. The IRS denied the claim. This case ensued.[2]

NDSU, located in Fargo, North Dakota, is a publicly funded institution of higher education that is subject to the authority of the North Dakota State Board of Higher Education (NDBHE). *See* N.D.Cent. Code §§ 15–10–1, 11 & 17 (1993 and Supp. 1999). While the NDBHE promulgates rules and regulations for the governance of state educational institutions, NDSU has some autonomy to promulgate its own policies consistent with those of the NDBHE. Both the NDBHE and NDSU have adopted an early retirement program whereby tenured faculty members and high-level administrators may be eligible for a payment of up to 100% of their final

year salary in return for retiring from NDSU.

The early retirement program is a mutually consensual program. Neither NDSU nor the tenured faculty member or administrator can unilaterally demand participation in the program, rather, both parties must mutually agree and consent to participation. There are, however, certain eligibility requirements that the tenured faculty member or administrator must meet. To be eligible for the program, the prospective retiree's age when added to their years of service at NDSU must equal or exceed 70 years.[3] Once eligibility is determined, the negotiation process begins.

Usually the prospective retiree and their supervisor, whether a dean, vice president, or department chair, negotiate the terms of the payment. While it is possible for the prospective retiree to receive a payment equal to 100% of his/her final year's salary, he/she is not entitled to a 100% payment, and amounts received have varied.[4] Many factors are considered in determining the retirement payment amount. Such things as past performance of the prospective retiree and his/her current salary, the curriculum needs of NDSU, and the available budget are considered. These are not, however, the only considerations and, in fact, there are no restrictions on the factors that a negotiating officer may consider.

Upon the successful completion of the negotiations, the parties enter into an early retirement agreement. As part of this agreement, the prospective retiree agrees

---

1. The assessments pertain to wages and payments paid during all quarters for the years 1991 to 1994, the last three quarters of 1995, all quarters of 1996, and the first two quarters of 1997. There is no dispute about the applicability of an income tax obligation. All payments referred to in this case were subject to payment of income tax. The disagreement solely involves the applicability of FICA taxes.

2. NDSU seeks to recover $369,984.17 in taxes assessed by the Internal Revenue Service (IRS) pursuant to the audit.

3. For a period of time, January 1, 1993 to June 30, 1997, the NDBHE lowered the required number to 65 years.

4. The NDBHE policy authorized payments of up to 100% of the final year salary; however, NDSU, acting within its authority, limited the payments to 50% from September 1, 1993 to June 30, 1995, and to 25% from June 30, 1995 to June 30, 1996. There were some exceptions, not pertinent here, to these lower percentages.

to give up his/her tenure rights, if applicable, and/or other notice rights, agrees not to seek employment with any other North Dakota public university or college, and also agrees to waive any claim he/she may have under the Age Discrimination in Employment Act in exchange for the negotiated payment.

As previously mentioned, eligible tenured faculty members have participated in the early retirement program. Tenure is an earned status, not an entitlement, which is only granted by an affirmative act of the NDBHE upon a favorable recommendation from NDSU. Both the NDBHE and NDSU have policies governing the eligibility for tenure. Essentially, only full-time tenure track faculty members are eligible for tenure. These faculty members must serve a probationary period of six continuous years of academic service during which the faculty member is annually evaluated. The probationary term provides NDSU an opportunity to observe the faculty member and determine if he/she is worthy of tenure. The general criteria for tenure include scholarship in teaching, contribution to a discipline or profession through research, other scholarly or professional activities, and service to the institution and society.[5]

Once tenure is granted, it applies only to the academic unit or program area in the institution in which it was granted and it confers a right to continuous academic year employment in that program area. The terms of tenure are not negotiable. A faculty member offered a tenured appointment must agree to those terms as defined by both the NDBHE and NDSU policies.

These terms provide that, subject to the approval of the NDBHE, a tenured faculty member may only be dismissed based on a demonstrably bona fide financial exigency, loss of legislative appropriations, loss of institutional or program enrollment, consolidation of academic units or program areas, or elimination of courses. In addition, a tenured faculty member may be dismissed for adequate cause. Adequate cause means a demonstrated incompetence or dishonesty in teaching, research, or other professional activities; continued or repeated unsatisfactory performance evaluations; substantial and manifest neglect of duty; conduct which substantially impairs the individual's fulfillment of his or her responsibilities; physical or mental inabilities to perform duties; and continued violations of NDBHE and NDSU policies.

Before any type of dismissal, the tenured faculty member is entitled to certain due process rights and procedures as set forth in both the NDBHE and NDSU policies. Notwithstanding these rights and terms of tenure, tenured faculty members and administrators are typically employed pursuant to one year renewable contracts. While administrators eligible to participate in the early retirement program usually do not have tenure,[6] they do have certain other employment rights such as a right to an increased notice period before termination.

At some time in 1991, questions arose at NDSU regarding the appropriate tax treatment of the early retirement payments. NDSU previously had been withholding FICA taxes from the payments. Prompted by these concerns, some research was done by the director of payroll and the general counsel. The research consisted of reviewing some privately published tax law treatises and contacting the IRS and the Social Security Administration (SSA) for their opinion.[7] Apparently NDSU was not successful at receiving an IRS opinion from the field office in Fargo,

---

5. Criteria may vary from department to department within NDSU as each department is free to establish the criteria which is important for the fulfillment of its own particular mission as long as the criteria are consistent with NDSU and NDBHE policy.

6. Some administrators were tenured faculty members prior to taking administrative positions.

7. Although the United States does not concede that anyone at the IRS was contacted, the court assumes the fact to be true.

North Dakota. Consequently, NDSU went to the SSA for advice.

The SSA informed NDSU by letter that according to its operations manual "a payment to secure the release of an unexpired contract of employment is not considered wages." Armed by this opinion, NDSU stopped withholding FICA taxes from the early retirement payments. Additionally, it is noted that NDSU neither requested a private letter ruling, although its general counsel was aware that one could be obtained, nor did it consult outside tax counsel.

NDSU also requests refunds for FICA tax assessments it paid on behalf of the wages earned by teachers and trainees who are citizens of other countries but working at NDSU on J–1 work Visas. NDSU treated these individuals as exempt from taxation based on its review of a privately published tax law treatise which contained incorrect information.

## III. Discussion

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *See also Minnesota Dept. of Revenue v. United States,* 184 F.3d 725, 728 (8th Cir.1999).

The "basic inquiry" for purposes of summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one sided that one party must prevail as a matter of law." *Quick v. Donaldson Co., Inc.,* 90 F.3d 1372, 1376 (8th Cir.1996) (citations omitted). In making this inquiry, however, this court will not "weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter." *Id.* Rather, this court's function is to determine only whether a dispute is genuine, and "[i]f reasonable minds could

differ as to the import of the evidence," summary judgment is inappropriate. *Id.* at 1377. This determination is made by reading the record in the light most favorable to the nonmoving party and drawing all "justifiable inferences" in the nonmovant's favor. *Id.*

### A. FICA Background

Central to the dispute between NDSU and the IRS is a determination of what constitutes "wages" within the FICA tax structure. The Internal Revenue Code provides that "every employer making payments of wages shall deduct and withhold upon such wages a tax determined in accordance with tables or computational procedures prescribed by the Secretary." 26 U.S.C. § 3402(a)(1). Wages generally "means all remuneration for employment," unless the remuneration falls within one of the specified exceptions.[8] *See* 26 U.S.C. § 3121(a). In turn "employment" is defined as "any service, of whatever nature, performed ... by an employee for the person employing him." *Id.* § 3121(b). These broad congressional definitions serve the purpose of FICA, "protecting beneficiaries from some of the hardships of existence," by allowing the taxes to capture an expansive range of employer-furnished remuneration. *See United States v. Silk,* 331 U.S. 704, 711, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947); *Helvering v. Davis,* 301 U.S. 619, 641, 57 S.Ct. 904, 81 L.Ed. 1307 (1937).

Similarly, courts have broadly construed the terms of FICA. In *Social Security Board v. Nierotko,* 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718 (1946), the Supreme Court instructed that the terms "wages," "employment," and "service" are to be broadly interpreted "to import breadth of coverage." Specifically, the Court explained that service includes nonproductive activity. *Id.* at 365–66, 66 S.Ct. 637. "We think that 'service' as used by Congress in this definitive phrase means not only work

---

**8.** It is undisputed that those exceptions are not applicable, although, in the court's view, some analogy to the exceptions might be arguable in this case.

actually done but the entire employer-employee relationship for which compensation is paid." *Id.*

At the circuit level, our Eighth Circuit has emphasized the importance of examining the entire employer-employee relationship when considering whether a payment is a wage for purposes of the withholding requirement. *See Newhouse v. McCormick & Co., Inc.*, 157 F.3d 582, 585 (8th Cir.1998). The circuit has instructed district courts on at least two occasions to look at the methodology used to calculate the payment to determine whether the payment was subject to FICA taxation. *See Mayberry v. United States*, 151 F.3d 855, 860 (8th Cir.1998); *Lane Processing Trust v. United States*, 25 F.3d 662, 665 (8th Cir.1994). Consequently, when factors traditionally associated with determining compensation, such as the value of services performed, the length of the employment, and prior wages, are used to calculate a payment, that payment is viewed as a wage. *Mayberry*, 151 F.3d at 860; *Lane*, 25 F.3d at 665.

With these instructions in mind, the court turns to the question at hand: determining whether the early retirement payments made to administrators and tenured faculty members were wages for purpose of FICA taxation. It is noted that the burden shifting provisions of the Internal Revenue Service Restructuring and Reform Act of 1998, 26 U.S.C. § 7491, do not apply in this case. Therefore, the determination of a tax deficiency and an assessment thereupon is presumptively correct; consequently, the taxpayer bears the burden of proving that the determination is erroneous. *Day v. Commissioner*, 975 F.2d 534, 537 (8th Cir.1992).

### B. Early Retirement Payments Made to Administrators

NDSU allowed certain administrators to participate in the early retirement program.[9] These administrators, non-classified and non-academic staff, are at-will employees and may be terminated without cause subject to the right of increased notice of termination.[10] NDSU Policy § 183(1); NDBHE Policy § 305.4(1). Specifically, three months notice is required during the first year of service; six months notice is required during the second year of service; twelve months notice is required thereafter. *Id.* In exchange for the early retirement payment administrators give up these notice requirements, forfeit ADEA claims, and agree not to work at any other state university or college.

NDSU argues that the early retirement payments are not remuneration for services because the administrators have been fully compensated for all their services to the university prior to the payment. Instead, NDSU argues that the payments are made for the purchase of a property right and consequently not wages. The court does not agree. The administrators are at will employees with no property interest in their positions.[11] Therefore, the court must consider the early retirement payment within the "entire employer-employee relationship for which com-

---

9. The eligible administrators include "the president, vice presidents, deans and officers of the institution who are members of TIAA/CREF, TFFR, and TIRF." *See* NDSU Policy § 360(2)(b); NDBHE Policy § 703.1(1)(b).

10. NDSU asserts that the administrators had rights not to be terminated without cause. This is a conclusion the court cannot accept since NDSU has presented no evidence, beyond its bald assertions, by way of copies of written contracts or policies that establish any legal rights beyond those provided in section 183 of NDSU's Policy Manual or section 305.4 of the NDBHE's Policy Manual. Although NDSU does point to some deposition testimony as evidence of the asserted rights, the court has reviewed that testimony and determines that it does not support NDSU's assertions. To the contrary, the deposition testimony clearly establishes that the administrators and officers may be terminated at will subject to the notice provisions.

11. NDSU asserts that some of the administrators who participated in the early retirement program were also tenured. In the court's view, those administrators participated in the early retirement program as administrators and not as tenured faculty.

pensation is paid." *See Nierotko,* 327 U.S. at 365–66, 66 S.Ct. 637.

The undisputed facts demonstrate that such factors as the length of employment and the prior salary were important in calculating the early retirement payments, not only for the administrators but for all prospective retirees. Indeed to be even eligible for the early retirement program the prospective retiree's age plus years of service has to equal 70 years,[12] and the amount of the payment was based on a percentage of the final year's salary. When payments are made to employees "based on factors traditionally used to determine employee compensation, specifically, the value of the services performed by the employee, the length of the employee's employment and the employee's prior wages" that compensation is treated as remuneration for employment, and thus constitutes wages. *See Lane,* 25 F.3d at 665. Consequently, the payments made to tenured administrators under the early retirement program are wages for FICA withholding purposes.

This conclusion is supported by similar cases where other types of employee payments were considered wages for FICA taxation purposes. *See Abrahamsen v. United States,* 44 Fed.Cl. 260, 272–73 (Fed.Cl.1999) (holding that downsizing payments constituted "wages" subject to FICA taxes); *Associated Electric Coop. v. United States,* 42 Fed.Cl. 867, 876 (Fed.Cl. 1999) (holding that "early out" payments arose out of the employer-employee relationship and were "wages" subject to FICA taxes). *See also Mayberry,* 151 F.3d at 860 (holding that ERISA class action settlement award was "wages"); *Lane,* 25 F.3d at 665 (holding that trust distributions made to employees were "wages"). To be sure, the circumstances of each of these payments were varied, however, the tie that binds the cases together is that where payments are based on the factors of length of service and rate

of pay the payments are deemed "wages" for purposes of FICA taxation.

NDSU looks to cases involving the self-employment tax to support its position that wages need to be tied to prior services for purposes of taxation. *See Gump v. United States,* 86 F.3d 1126 (Fed.Cir. 1996); *Milligan v. Commissioner,* 38 F.3d 1094 (9th Cir.1994). Notwithstanding the propriety of relying on self-employment tax case-law in determining a FICA tax question, an issue the court does not decide, the court is constrained to note the case of *Schelble v. Commissioner,* 130 F.3d 1388 (10th Cir.1997). In *Schelble,* the court examined whether an extended earnings payment received by an independent insurance agent upon termination of the agency agreement was "self-employment income" subject to the self-employment tax. 130 F.3d at 1392–94. The rationale used in *Schelble* is similar to that used in FICA tax cases, in that the court found where payments are tied to quantity and quality of services performed and the amount of payment is based on length of service and prior fees paid, the payment is subject to self-employment taxation. *Id.* Consequently, even if the court were to rely on the line of authority proposed by NDSU, the result would remain unchanged. The early retirement payments were tied to length of service and prior salaries and thus subject to taxation.

NDSU's next argument is that if the payments are determined to be wages, it is protected by the "deputy tax collector" defense. Generally, the "deputy tax collector" defense is an equitable defense that provides it is unfair to hold an employer liable for failure to withhold taxes unless there was "precise and not speculative" notice of the duty to withhold. *See Central Illinois Public Service Co. v. United States,* 435 U.S. 21, 31, 98 S.Ct. 917, 55 L.Ed.2d 82 (1978); *See also General Elevator Corp v. United States,* 20 Cl.Ct. 345 (1990). Importantly, prior to 1991, NDSU

---

**12.** As explained in footnote # 3, *supra,* for a period of time the program was extended to those whose total equaled 65 years.

did withhold FICA taxes from the early retirement payments. It was not until the prospective retirees and retired employees began questioning the withholding that NDSU did some research and changed its position. In light of the foregoing, the court is simply unconvinced that the "deputy tax collector" defense is applicable to NDSU.

NDSU has failed to carry its burden of demonstrating that these tax assessments were erroneous. Thus, summary judgment is **GRANTED** in favor of the United States regarding the taxes assessed on the early retirement payments made to administrators.

### C. Early Retirement Payments Made to Tenured Faculty Members

 The court views the tenured faculty members quite differently from the administrators in this case. Although the court finds NDSU responsible for paying FICA taxes on the early retirement payments made to the administrators, the payments made to tenured faculty members are a separate matter. NDSU asserts that the early retirement payments made to tenured faculty are not remuneration for services but instead are payments made for the purchase of a property interest, namely tenure.

Crucial to the determination of this issue is an understanding of the unique and intangible quality of "tenure." Tenure is an ethereal concept; although commonly understood, tenure escapes precise definition. To add to its abstract nature, tenure only truly exists in a small, albeit important, niche of the world, namely on college and university campuses. Yet in this niche, tenure is an extremely valuable achievement.

Both the NDSU and NDBHE policy manuals say this of tenure: "A college or university is a forum for ideas, and it cannot fulfill its purpose of transmitting, evaluating, and extending knowledge if it requires conformity with any orthodoxy of content and method. Academic freedom and tenure are both important in guaranteeing the existence of such a forum." NDSU Policy Manual § 350.1(1)(a); NDBHE Policy Manual § 605.1(1)(a). While tenure and academic freedom mutually protect the "forum for ideas" that exists at colleges and universities, the purpose of tenure is to protect academic freedom. NDSU Policy Manual § 350.1(1)(b); NDBHE Policy Manual § 605.1(1)(b). See also Grimes v. Eastern Illinois Univ., 710 F.2d 386, 388 (7th Cir.1983) (noting that "[t]he purpose of tenure is to protect academic freedom—the freedom to teach and write without fear of retribution for expressing heterodox ideas").

Academic freedom applies to all scholarly pursuits and is fundamental to the advancement of knowledge.[13] NDSU Policy Manual § 350.1(1)(b); NDBHE Policy Manual § 605.1(1)(b). Faculty members understand that tenure "gives a professor the freedom to teach without fear of political intimidation or any retaliation" for the views taught. (Clifford Dep.Ex. H at pg 12.)

Tenure protects academic freedom by limiting the authority of a college or university to terminate a tenured faculty member. Both the NDSU and NDBHE policies regarding tenure state that "ten-

---

**13.** The Supreme Court has said this of academic freedom:

The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot

be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die. *Sweezy v. State of New Hampshire*, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957).

ured appointments recognize a right ... to continuous academic year employment." NDSU Policy Manual. § 350.1(4)(b); NDBHE Policy Manual § 605.1(4)(b). In other words, once granted, "tenure is 'a faculty appointment for an indefinite period of time.'" *Robinson v. Ada S. McKinley Community Serv.*, 19 F.3d 359, 361 (7th Cir.1994) (citations omitted). The contract of a tenured faculty member can only be terminated under narrow circumstances; examples of which are loss of legislative appropriations, or substantial and manifest neglect of duty. In fact, tenure is recognized as a relinquishment of an employer's unfettered power to terminate. *Id.*

Due to the protection tenure affords a faculty member, the award of tenure is not done lightly, at NDSU or other universities. *See, e.g., Mayberry v. Dees*, 663 F.2d 502, 513–18 (4th Cir.1981) (explaining generally the tenure conferral process). It is preceded by up to six years of probationary status, wherein the faculty member is reviewed at least annually. Even upon satisfactory performance during the probationary period, tenure cannot be demanded by the faculty member. It is not an entitlement. Tenure can only be granted, upon institutional recommendation, by the North Dakota Board of Higher Education. Even upon legitimate termination upon one of the enumerated reasons, substantial and significant review procedures are in place which guarantee the tenured faculty member due process of law before termination. Consequently, these points demonstrate that tenure is a valuable achievement.

Indeed the value of tenure cannot be disputed. There can be no doubt, and the United States concedes, that tenure establishes a constitutionally protected property interest in continued employment. *See Morris v. Clifford*, 903 F.2d 574, 576–77 (8th Cir.1990); *Agarwal v. Regents of the Univ. of Minnesota*, 788 F.2d 504, 507–08

& n. 2 (8th Cir.1986); *Stermetz v. Harper*, 763 F.2d 366, 367 (8th Cir.1985); *O'Neal v. City of Hot Springs Nat'l Park*, 756 F.2d 61, 62–63 (8th Cir.1985).

With that understanding of the importance and nature of tenure in mind, the court faces the question whether an early retirement payment to a tenured faculty member is remuneration for services, and thus a wage, or whether it is a payment for something more. The United States argues that the payment is made merely for the forfeiture of an employment right, tenure being no different from any other employment right. NDSU contends that tenure is distinct, as a recognized property interest, and that the payment is made for the purchase of that property interest. The issue is a complex one; and as the parties have recognized, there is no clear guiding authority on the issue.

The court is aware that tenure, a recognized property interest, arises within the entire employer-employee relationship. As such, a payment for tenure is similar to other payments arising out of the employer-employee relationship which have been treated as wages.[14] *See Mayberry*, 151 F.3d at 860 (treating an ERISA settlement award as wages); *Lane*, 25 F.3d at 665 (treating trust distributions as wages); *Abrahamsen*, 44 Fed.Cl. at 272–73 (treating downsizing payments as wages); *Associated Elec.*, 42 Fed.Cl. at 871–72 (treating voluntary "early out" payments as wages). Payment for tenure, however, is something more than a payment for any of these other employment interests.

Defining what that "something more" is lies at the very core of tenure. Tenure is a constitutionally protected property interest in continued employment. Thus, it is comparable to a contract right. The IRS's own revenue rulings recognize that a lump sum payment received by an employee as consideration for the cancellation of his employment contract is not subject to

---

**14.** Unlike this case, the *Mayberry, Lane, Abrahamsen*, and *Associated Electric* cases did not involve the relinquishment of a recognized employee property interest. Those opinions are not directly on point and therefore neither binding nor persuasive in the instant situation.

FICA taxes. *See* IRS Rev. Ruling 58–301, 1958–2 C.B. 23. In the ruling, the taxpayer was employed under a five year written contract; during the second year of employment, the employee and employer agreed to cancel the remaining period of the contract and the employee was paid a lump sum of money for the relinquishment of his contractual rights. *Id.* The IRS held that the payment was not subject to FICA taxation. *Id.*

The situation at hand is not substantively different. Once tenure is granted it extends indefinitely into the future and can only be terminated by NDSU under narrow circumstances. Additionally, NDSU has no authority to compel participation in the early retirement program, nor does the tenured faculty member have the authority to demand a tenure buyout. Significantly, NDSU uses the early retirement program in situations where there is not sufficient justification for a termination. These factors compel the conclusion that the early retirement payment is for the purchase of the tenure rights.

The United States argues that the 1958 revenue ruling has been distinguished to its facts by later rulings and thus is not persuasive. The United States points to Revenue Ruling 75–44 to support its proposition. In Revenue Ruling 75–44, the IRS held that a lump-sum payment received by a railroad employee as consideration for relinquishing employment seniority rights is compensation for services and wages. IRS Rev. Ruling 75–44, 1975–1 C.B. 15. In the 1975 revenue ruling, the employee had acquired seniority rights through his previous performance of services to the employer. *Id.* At some point, the employee was paid a lump-sum to relinquish his seniority rights. *Id.* The IRS opined that since the employment agreement was not for a definite term and was "generally terminable by either party without liability to the other solely for the failure to maintain the relationship for a specified period" the 1958 revenue ruling

was not controlling. *Id.* Based on those distinguishing factors, it was determined that the lump-sum payment was remuneration for the employee's past performance of services. *Id.*

The 1975 revenue ruling is not persuasive for at least two reasons. First, the court is not convinced that there is a substantive difference between employment rights, whether arising in contract or property, that are established at the outset of the relationship and those that accrue over time which warrants different tax treatment. Second, the tenure rights in the instant case are not equivalent to seniority rights. While it is true that tenure is awarded based on proven past performance, it is not a right that can be demanded. No faculty member is entitled to tenure. Unlike seniority rights it does not naturally accrue based solely on the passage of time. Tenure must be granted, and once granted it establishes rights that did not previously exist.

Based on these factors, tenure is more akin to the contract rights at issue in the 1958 revenue ruling. Consequently, a payment for relinquishing tenure rights is a payment for the purchase of a property interest. As a purchase of a property interest, the payment is not a "wage" or "remuneration for services," and thus not subject to FICA taxation. Therefore, summary judgment is **GRANTED** in favor of NDSU regarding its claim for a refund on the taxes assessed on early retirement payments made to tenured faculty members.[15]

### D. J–1 Visa Employees

NDSU has not and cannot argue that the wages it paid the J–1 Visa employees are not subject to FICA taxes. The law is clearly settled on this issue. As discussed above, FICA taxes must be withheld from the "wages" of all employees unless specifically excepted under 26 U.S.C. § 3121(b). One exception to the withholding requirement relates to "ser-

---

**15.** The court understands that the government will work with NDSU to agree and stipulate to the actual amounts of refunds owed.

vice which is performed by a nonresident alien." 26 U.S.C. § 3121(b)(19). Resident aliens, however, are subject to the tax. A "resident alien" is an individual who: 1) is lawfully admitted for permanent residence; 2) *has been in the United States long enough to satisfy the "substantial presence" test;* or 3) makes an election to be treated as a resident alien. 26 U.S.C. § 7701(b)(1) (emphasis added).

The "substantial presence" test is satisfied when that individual is present in the United States for at least 31 days during the year and the number of days present in the United States during the previous two years, when multiplied by a multiplier, equals or exceeds 183. *See id.* § 7701(b)(3). Days spent as an "exempt individual" do not count towards the "substantial presence" test. *See id.* § 7701(b)(3)(D). An "exempt individual" includes a person working as a teacher or trainee on a J–1 Visa. *Id.* § 7701(b)(5)(A). The exemption, however, is limited to "2 calendar years during the preceding 6 calendar years," after which the time starts running for the "substantial presence" test as discussed above. *See id.* § 7701(b)(5)(E). Thus, once the substantial presence test is satisfied the FICA taxes must be withheld.

NDSU does not dispute this, instead it argues that it is excused from its failure to withhold the FICA taxes based on the "deputy tax collector" defense. As explained above, the "deputy tax collector" defense protects an employer from failure to withhold taxes if the employer did not have "precise and not speculative" notice of the duty to withhold. *See Central Illinois Public Service Co. v. United States,* 435 U.S. 21, 31, 98 S.Ct. 917, 55 L.Ed.2d 82 (1978); *See also General Elevator Corp. v. United States,* 20 Cl.Ct. 345 (1990).

The government argues that the defense is inapplicable since the law was clearly established prior to 1992 the applicable year in question. The government is correct. NDSU simply did not thoroughly research the issue, but instead relied on an outdated privately published tax law trea-

tise. The court cannot allow a sophisticated taxpayer such as NDSU to assert the "deputy tax collector" defense based on inadequate research done on an issue-that was clearly established by the applicable statutes. Consequently, summary judgement is **GRANTED** in favor of the United States regarding the tax assessments paid on the wages of the J–1 Visa employees.

## IV. Conclusion

Summary Judgment is **GRANTED** in favor of the United States regarding the taxes assessed on the early retirement payments made to administrators. NDSU's claim for refund on FICA tax assessments paid on the early retirement payments made to administrators is **DISMISSED.** Summary judgment is **GRANTED** in favor of NDSU regarding its claim for refund on taxes assessed on the early retirement payments made to tenured faculty members. Summary judgement is **GRANTED** in favor of the United States regarding the taxes assessed on the wages of the J–1 Visa employees. NDSU's claim for refund on FICA tax assessments paid on wages of the J–1 Visa employees is **DISMISSED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**